COMMONWEALTH *vs.* JONATHAN V. TROWBRIDGE.

No. 92-P-1412.

Middlesex. December 8, 1993. - July 5, 1994.

Present: PERRETTA, DREBEN, & LAURENCE, JJ.

Further appellate review granted, 418 Mass. 1107 (1994).

*Rape. Indecent Assault and Battery. Child Abuse. Evidence*, Expert opin-
ion, Hearsay, Sexual conduct, Fresh complaint, Corroborative evidence,
Grand jury proceedings. *Witness*, Expert, Child, Competency. *Practice,
Criminal*, Instructions to jury, Grand jury proceedings, Judicial discre-
tion. *Grand Jury.*

At the trial of an indictment for indecent assault and battery on a child
under the age of fourteen the judge properly excluded expert testimony
proffered by the defendant essentially on the issue of the child's credi-
bility [740-741], as well as expert testimony about the personal rela-
tionship between the defendant and the child (his daughter) [741], and
expert testimony that the defendant did not fit the "profile" of a sexual
abuser [741].

There was no substantial risk of a miscarriage of justice, much less error,
in a judge's determination at the trial of an indictment for indecent
assault and battery on a child under the age of fourteen that the eight
year old child witness was competent to testify. [741-742]

At the trial of a criminal case, the judge erred in allowing certain hearsay
evidence, and certain other second level hearsay, arguably admissible,
but unnecessary for the purpose and inflammatory. [742]

At the trial of an indictment for indecent assault and battery on a child
under the age of fourteen, the judge incorrectly allowed expert testi-
mony on behalf of the prosecution that went beyond a description of
behavioral manifestations of sexually abused children by improperly re-
lating such manifestations (or lack thereof) to the child in question by
means of a hypothetical question. [742-743]

At the trial of an indictment for indecent assault and battery on a child
under the age of fourteen, the admission of repetitious fresh complaint
testimony by four witnesses without limiting instructions from the judge
as each witness testified, and without any instruction at all that the jury
could not use the fresh complaint evidence substantively, created a sub-
stantial risk of a miscarriage of justice and a new trial was required.
[743-747]

In a criminal case, there was no showing that the prosecution knowingly
deceived or misled the grand jury or failed to disclose evidence that
would have affected the grand jury's decision to indict. [747]

There was no error at the trial of a sexual abuse case in permitting a child
witness to refer to an anatomically correct doll or in allowing the doll to
be taken to the jury room during deliberations. [747-748]


INDICTMENT found and returned in the Superior Court De-
partment on August 8, 1989.

The case was tried before *Walter E. Steele*, J.

*Esther J. Horwich* for the defendant.

*David E. Edmonds*, Assistant District Attorney, for the
Commonwealth.

DREBEN, J. The defendant was tried on two indictments,
one for rape of a child under sixteen and the second for inde-
cent assault and battery on a child under the age of fourteen.
He was acquitted on the rape charge, but convicted of inde-
cent assault and battery. On appeal he claims numerous er-
rors.[1] We reverse because of a substantial risk that the jury
gave substantive effect to oft repeated fresh complaint and
other hearsay evidence.

The incidents charged in the indictment occurred during
the fifteen-month period beginning shortly after the child's
fifth birthday. Her parents were divorced and, during the rel-
evant period, the child lived in Connecticut with her mother
and visited the defendant, her father, at his home in Massa-

---

[1]The defendant's claims include: (1) that his expert witness, a psycholo-
gist, should have been allowed to testify that the child's mother had con-
veyed to her daughter her extreme hatred for the defendant, the child's
father, that he had personally observed a warm relationship between the
father and his daughter, and that the defendant did not have the personal-
ity profile of a sexual abuser; (2) that the child should not have been found
competent to testify and the judge should have allowed her to be examined
by a psychiatrist; (3) that the prosecutor acted improperly in accusing the
defendant of lying, in deliberately eliciting testimony that the child had
appeared before a grand jury, in interrupting the defense counsel's exami-
nation of the child and in misstating testimony in closing argument; (4)
that unreliable hearsay statements were erroneously admitted into evi-
dence; (5) that the child should not have been permitted to use an anatom-
ically correct doll and that the doll, which was not an exhibit, should not
have been allowed into the jury room; (6) that the instructions on indecent
assault and battery were incorrect; and (7) that the defendant's motion to
dismiss the indictments should have been allowed because the prosecutor
failed to present exculpatory evidence to the grand jury.

chusetts on alternate weekends. The indictments were brought as a result of disclosures made by the child to her first grade teacher in March, 1989.

The Commonwealth called five witnesses: the child, who at that time was in the third grade and almost eight, her mother, her teacher, a school social worker, and a pediatric gynecologist. In order to convey the force of the repetitive fresh complaint testimony, as well as the other evidence at trial which increased the risk of the jury giving substantive effect to hearsay testimony, we set forth in some detail the Commonwealth's case as presented at trial.

The child, the first witness, testified that on more than one occasion when she visited her father, he put her on the bed in her room, lifted up her clothes and touched her "private parts." Using an anatomically correct doll, she indicated that the area of the doll's vagina, her breasts and her buttocks were "private parts." Once, she felt her father's finger go inside her vagina and "it really, really hurt."

Her teacher during the period covered by the indictments, Janet Joyce, testified that during kindergarten the child cried on Friday afternoons. Over objection, she was permitted to state that the child, when asked why she was crying, answered that she did not want to go visit her father and that she did not like her father. Recognizing that the teacher would soon be discussing fresh complaint testimony, defense counsel requested a limiting instruction. The Commonwealth, however, insisted that its questioning went to the child's state of mind and no instruction was given.

The teacher later testified that, in March, 1989, she conducted a special class for the first grade on personal safety. Among other matters discussed in class were good and bad touching. She explained to the class that private body parts are the parts that are covered by bathing suits. After class, the child came up to her and said, "You know I go to my therapist, because I talk to him about my daddy touching me." Over objection, the teacher repeated the child's statement, "I go to my therapist to talk to him about when my daddy touches me in my private body parts." After the

child's disclosure, the teacher informed the school's social worker and the principal.

The school's social worker was the next witness. After receiving the teacher's report, she interviewed the child and discussed good and bad touchings with her. The child said that her mother would give her a good touch. When asked who would give her a bad touch, she said, "My dad, he would touch my private bottom parts." The social worker reported in detail what the child had said as to where and when it happened, and explained that the child had pointed out the vagina, buttocks, and breasts on a diagram. The social worker testified that in a subsequent interview, she had asked the child if anyone ever had told her to say that her dad touched her, that is, gave her bad touches, and the child had said, "No one ever told [me] that."

The child's mother testified that the child's visits with her father began when the child was one and one-half years old, that the mother noticed that in the fall of 1984 (when the child was two) she had behavioral changes: she would use phrases like "mommy the enemy," she urinated like a boy in the bathroom although she was potty trained, and she masturbated. The mother brought her to a number of physicians, and brought her concerns to the attention of the Connecticut court during her divorce proceedings. She testified that the child said she did not want to go to daddy's house. While the matter was under consideration by the court, only supervised visits were permitted, but in October, 1987, the court permitted unsupervised visits to resume. The child's behavior became worse and she stated she did not want to visit. In March, 1989, after the disclosures at school and after speaking to the school social worker and the Department of Children and Youth Services, the mother contacted the Framingham police and also took the child for a gynecological examination with Dr. Arsenault-Gillotti. The mother testified that the police did not give her details of what the child had told them, but after her discussion with them about the

charges, she understood the abuse to be that her daughter "had been fingered by her father."[2]

The last Commonwealth witness was Dr. Arsenault-Gillotti, the pediatric gynecologist who had examined the child. She had extensive experience in the area of sexual abuse. After listing some of the behavioral manifestations of sexually abused children, she pointed out that where the perpetrator has a close relationship to the victim, the abuse is usually done in a gentle manner and there are rarely physical findings. She saw the child in May, 1989, with her mother and grandmother. The child clung to her mother and did not make eye contact with the witness, and over objection, the doctor testified that "that is a common reaction of a child who has been sexually abused."

The doctor questioned the child as to why she was there, and when she did not respond, she asked her if she would like her mother to tell. The child nodded, and the mother, in response to questioning, "stated that [the child] had disclosed that her father had fingered her vagina." Asked if that was correct, the child nodded. After conducting a gynecological examination, during which the child cried, the doctor left the room but was called back by the grandmother. Over defense counsel's objection, the doctor testified that the grandmother reported that the child had said "that's what it felt like when her father touched her." The judge told the jury that the statement is "not being offered for the truth of the matter asserted, but may be what leads the child to talk to the doctor and what she said. So, with that limitation, you may consider it." The doctor related that after the grandmother's statement, she, the doctor, asked the child if it hurt when her father touched her, and the child "said it made her cry, only he doesn't stop."

The doctor stated there were no physical signs of trauma. She was allowed to give her opinion that her findings were totally consistent with the hypothetical set of facts described

---

[2]Although defense counsel objected, the court made no ruling. The next question to the mother was, "Is that your interpretation?" She answered, "Yes."

in the margin.[3] Over objection, she was allowed to explain why they were consistent, namely, because there "are rarely any physical findings in children who are sexually abused."

The focus of the defense was that the father had a loving relationship with the child, and the mother prevented visitation whenever she could, and, in order to stop all visitation, influenced the child to relate that sexual contacts had occurred. There was extensive evidence from family members and neighbors that the child did not want to leave after her visits with the father and enjoyed her visits with him. The father also explained his vaginal touching, and on cross-examination, the child acknowledged that she had been chafed by her bathing suit and that the ointment applied by her father had made her feel better.

The defendant attempted to introduce evidence from a psychologist who had examined the child for the Connecticut court. He had evaluated both parents, had seen the child with each of them, and had in writing reported[4] that he could find no evidence of sexual abuse and that it was his impression that the child's behavior regression after visits with her father was "a function of [her] identification with her mother in her battle against her former husband." The judge held a voir dire, at which he, as well as defense counsel, questioned the proposed expert. The witness stated that the mother was a very angry and bitter woman, that she was conveying to the child her extreme hatred for the father, and that the child at the tender age of four and one-half was identifying with and becoming an ally to her mother in her ongoing struggle against the father. He stated that since he found no evidence to support allegations of sexual abuse, he had in his written report recommended reinstituting un-

---

[3]The doctor was told to assume the following facts: "That there was touching, or fondling, in the vaginal area, and a one time digital penetration. Assuming further that this occurred at most every other weekend for a period of one and a half years, and assuming further that there were no objects used and it was done in a careful fashion, or a loving fashion — strike that — in a careful fashion, and assuming further that the last possible contact would have been February 26, 1989."

[4]The report was made part of the voir dire.

supervised but monitored visitation.[5] He also testified that the child was very relaxed and affectionate with the father and seemed to enjoy being in his presence. He looked for anxiety or discomfort, but found none.

Although the judge found the psychologist "eminently qualified," he refused to allow him to testify, ruling that "the most this gentleman had said, albeit a professional opinion, is an opinion indirectly of the credibility of the child, . . . [that] in his opinion, the child is lying." The judge also refused to let the psychologist testify to his observations of the relationship between the father and the child, saying that that could be proved, but not through the help of an expert.

1. *Defendant's expert testimony.* A trial judge has broad discretion in the admission of expert testimony, and his or her conclusions in such matters will rarely be disturbed. *Commonwealth* v. *Ianello*, 401 Mass. 197, 200 (1987). There was no error in excluding the defendant's expert's testimony.

(a) The defendant claims that the expert should have been permitted to testify concerning the animosity of the mother and how it could have influenced the child's perceptions and her accusations. In *Ianello*, where similar arguments were made, the Supreme Judicial Court upheld the decision of a trial judge precluding an expert from testifying "on the likelihood of a child's lying about sexual abuse if the child's parents were locked in a custody or visitation dispute." *Id.* at 201. The court held that the trial judge did not abuse his discretion, and noted that had the testimony "erroneously been allowed," the expert "would have impermissibly intruded upon the vital function of the jury." *Id.* at 202. See *Commonwealth* v. *Montanino*, 409 Mass. 500, 504 (1991) (error to admit testimony of commanding officer of police department's sexual assault unit concerning the credibility of "most" sexual assault victims as such testimony would be taken by the jury as an endorsement of the victim's testi-

---

[5]By "monitored" he meant that some intervening professional should "keep an eye on the situation."

mony). See also *Commonwealth* v. *Reed*, 417 Mass. 558, 561 (1994).

(b) While the judge in his discretion could have permitted the expert to testify to the personal relationship between the father and his daughter, he was well within his discretion in determining that expert testimony would not be needed on this issue.

(c) Assuming that the claim is properly before us, the rejection of evidence that the defendant did not fit the personality profile of a sexual abuser was also within the judge's discretion. *State* v. *Hulbert*, 481 N.W.2d 329, 332-333 (Iowa 1992). *State* v. *Fitzgerald*, 382 N.W.2d 892, 894-895 (Minn. App. 1986). *State* v. *Miller*, 709 P.2d 350, 352-353 (Utah 1985). *State* v. *Friedrich*, 135 Wis. 2d 1, 9-16 (1987). He could well have determined that "the mere fact that a defendant does [not fit] the profile" does not tend to prove anything. Cf. *Commonwealth* v. *Day*, 409 Mass. 719, 722-724 .(1991). We need not decide whether it would have been error to allow the admission, but note that numerous authorities elsewhere preclude such evidence. See, e.g., *Pendleton* v. *Commonwealth*, 685 S.W.2d 549, 553 (Ky. 1985); *State* v. *Ambrosia*, 67 Ohio App. 3d 552, 562 (1990); *Williams* v. *State*, 649 S.W.2d 693, 695-696 (Tex. Ct. App. 1983). The exclusion is often on the ground that "scientific and clinical literature does not support the conclusion that there is a reliable profile or set of personality traits found in 'typical' sex offenders." 1 Myers, Evidence in Child Abuse & Neglect Cases § 4.50, at 331 (2d ed. 1992). See, e.g., *United States* v. *St. Pierre*, 812 F. 2d 417, 420 (8th Cir. 1987); *State* v. *Person*, 20 Conn. App. 115, 123-126 (1989), aff'd, on other grounds, 215 Conn. 653 (1990), cert. denied, 498 U.S. 1048 (1991); *State* v. *Elbert*, 831 S.W.2d 646 (Mo. Ct. App. 1992); *State* v. *Cavallo*, 88 N.J. 508, 520-523 (1982). Contra *People* v. *Stoll*, 49 Cal. 3d 1136, 1146-1162 (1989) (error to exclude); *Freeman* v. *State*, 486 P.2d 967, 974 (Alaska 1971) (allowing proof of character by opinion testimony).

2. *Competency of child.* Although he did not make the argument at trial, the defendant now challenges the judge's de-

termination of the child's competency. There was no error, let alone a substantial risk of a miscarriage of justice. The child was almost eight at the time of trial, and neither the voir dire nor her testimony at trial in any way suggests that the judge abused his discretion in finding her competent. The arguments based on her failure to remember some facts and on an alleged inconsistency in some of her answers are without merit and are disposed of by our recent discussion in *Commonwealth* v. *Gamache*, 35 Mass. App. Ct. 805, 807-808 (1994). The judge's decision not to seek the assignment of a qualified physician or psychologist from the Department of Mental Health was, as expressly stated in G. L. c. 123 § 19, a matter within his discretion.

3. *Hearsay testimony of teacher and doctor.* We agree with the defendant's claim that it was error to allow the ,child's teacher to testify, over objection that "[s]he would just say I don't want to go visit my daddy. I don't like my daddy." The Commonwealth's argument that it was a spontaneous utterance, and, therefore, an exception to the rule against hearsay, is without merit.[6]

We also agree with the defendant that the pediatric gynecologist should not have been allowed to testify as to what the grandmother had reported the child had said ("That's what it felt like when her father touched her").[7] Although this second level hearsay was a way to explain the doctor's subsequent colloquy with the child, it was unnecessary for this purpose, and led to an additional repetition of distasteful and inflammatory testimony. See *Commonwealth* v. *Licata*, 412 Mass. 654, 660 (1992) (judge may well limit testimony which would incite a jury through a "needless rehearsal of the particulars of a gruesome crime").

4. *Commonwealth's expert testimony.* As we related earlier, the prosecution's expert, the pediatric gynecologist, was

---

[6]Recognizing that the child's state of mind was not a material issue in determining the defendant's guilt, the Commonwealth no longer justifies the admission of the child's statement on that basis.

[7]The defendant's argument on this point is very brief and probably does not conform to the requirements of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

allowed to testify about the behavioral manifestations of sexually abused children, to state that this child's clinging to the mother and not making eye contact "is a common reaction" of a child who has been sexually abused, and to give her opinion that her finding of no physical signs of trauma was totally consistent with the hypothetical posed by the prosecutor. While it would be permissible to explain that sexually abused children do not necessarily manifest physical symptoms of abuse, the physician's testimony went further and specifically connected the absence of physical signs to the hypothetical, see note 3 *supra*, which was directed exactly to the experience of this child. The import of the cases which allow testimony as to "general characteristics" of abused persons, e.g., *Commonwealth* v. *Dockham*, 405 Mass. 618, 628 (1989), *Commonwealth* v. *Mamay*, 407 Mass. 412, 421 (1990), and *Commonwealth* v. *Hudson*, 417 Mass. 536, 541 (1994), is that there must be no direct reference to the child or her symptoms. The prosecution is "to avoid involvement in the question whether . . . [the child's] behavior did or did not in fact conform to the general characteristics." *Commonwealth* v. *O'Brien*, 35 Mass. App. Ct. 827, 832 (1994). *Commonwealth* v. *McCaffrey*, *ante* 583, 590-594 & n.6 (1994).

Here "[n]ot only did [the doctor's] opinion evidence cross the line between description of typical symptoms of sexually abused children and testimony relating those symptoms to the victim in the case, but it also created a substantial risk of the jury giving substantive effect to the same witness['s] fresh complaint testimony." *Commonwealth* v. *Swain*, *ante* 433, 444 (1994).

5. *Judge's charge.* We now turn to the judge's instructions, the context in which they were given, and the relevant law. Although all of the prosecution witnesses, other than the child, testified to what the child had said,[8] the trial judge did not at any time prior to his final instructions make reference

---

[8]The child's mother in effect testified to what the child had told the police officer.

to the limited purpose of such testimony. His complete charge on fresh complaint is set forth in the margin.[9]

In this case four witnesses reiterated the graphic account they had heard from the child as to what happened to her when she was five and six years old. Although the details did not exceed the child's testimony, the prejudice of repetition is obvious, particularly in view of the recoil most adults sense where a child is the victim. In *Commonwealth* v. *Swain, supra* at 439, we held that undue repetition of fresh complaint testimony created a substantial risk of a miscarriage of justice. "The risk of such 'piling on' of evidence is that a 'jury will use the details of the fresh complaints as substantive evidence that the crime actually occurred.' " *Id.* at 442, quoting from *Commonwealth* v. *Lavalley,* 410 Mass. 641, 646 (1991).

Where there is such repetition, cautionary measures are crucial. "The trial judge should instruct the jury as the evidence is admitted and again during the jury instructions that fresh complaint testimony does not serve as substantive evi-

---

[9]"Now, in connection to both of these offenses, there has been reference to what the child said to her mother or teachers or whomever, promptly, or reasonably promptly after these alleged acts.

"Now, what a person says outside of court, as you probably heard during the course of this trial is hearsay, but like most rules of law, there are more exceptions, and the exception we talk about in this case is in a case of this type, especially a child, if the child makes a complaint, reasonably soon after the alleged event, then that is admissible in court to corroborate the victim's testimony in this court.

"Now you've heard the testimony, and certain witnesses testified to what the victim said to them about the alleged offense, and as I say, ordinarily a witness' testimony regarding the victim's statements is not allowed to prove the facts contained in the statement because they're, generally speaking, hearsay.

"However, testimony given to the witnesses in this case, as to what the victim told them, is called fresh complaint, and may be considered only for the purpose of corroborating the victim's testimony in this trial, so you may consider it only as corroborative.

"Thus, you may use this testimony to decide whether or not the fact that the victim made the complaint to these witnesses corroborates her testimony. Before you consider whether the statements are corroborative of the victim's testimony, you should consider whether or not the complaints were made reasonably promptly." The judge then went on to give instructions to the jury for determining "freshness."

dence that the crime in fact occurred. The judge should instruct the jury that the purpose of the fresh complaint evidence is to corroborate the victim's testimony, namely, as it relates to the credibility of the victim's testimony at trial." *Commonwealth* v. *Licata*, 412 Mass. at 660. In *Commonwealth* v. *Scanlon*, 412 Mass. 664, 674 (1992), the court amplified these precautions, stating that an instruction which merely states that "such evidence may be used only to corroborate the complaining witness's testimony" is insufficient "to alleviate the risk that the jury [may] use such evidence substantively." There must also be a definition of corroboration,[10] and the jury must be informed that they cannot use the evidence to establish any fact on fresh complaint testimony alone. In *Scanlon*, the instructions were deemed adequate because as testimony from each fresh complaint witness was received, the judge informed the jury that they could not use the evidence substantively.

In the present case, the judge not only did not instruct the jury at all as to the limited purpose of the evidence as each fresh complaint witness testified, but he also never explained that the jury could not use the fresh complaint evidence substantively. To the contrary, he may have led the jury to believe that they could. By the use of the word "however," he contrasted the fresh complaint "in this case" with the rule that "ordinarily a witness's testimony regarding the victim's statements is not allowed to prove the facts contained in the statement . . . ." Despite his repeated admonition that the jury use such statements "only as corroborative," his failure to explain that term and his juxtaposition of fresh complaint testimony with the normal hearsay rule, created a serious risk that the jury would treat the hearsay testimony substantively.

---

[10]Corroborative testimony is defined as "testimony which tends to strengthen, confirm or make more certain the testimony of another witness." *Commonwealth* v. *Licata*, 412 Mass. 654, 657 n.6 (1992), quoting from *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 523 (1991). *Commonwealth* v. *Fleury*, 417 Mass. 810, 813 n.3 (1994).

The only meritorious objection properly preserved at trial and adequately argued on appeal was the admission of the child's statement reported by her teacher that she did not like her father and did not want to visit him. Although that error alone would not require reversal in view of the far more prejudicial fresh complaint evidence and the similar unobjected-to statements by the mother, we consider this to be one of the rare cases where, despite the defendant's failure to call attention to the errors, the verdict must be set aside in order to prevent a substantial risk of a miscarriage of justice.[11] *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987). *Commonwealth* v. *Almon*, 30 Mass. App. Ct. 721, 724 (1991).

The Commonwealth's case was not overwhelming, apart from the fresh complaint testimony. It turned entirely on the child's credibility. The defense that the mother had coached the child to preclude visitation was plausible, especially in light of the Connecticut court's reinstitution of unsupervised visitation. The defendant presented several disinterested witnesses to attest to the affectionate behavior of the child. What was overwhelming was the fresh complaint testimony, particularly that of the doctor. The risk that the jury would use that testimony substantively was great — there was "piling on" of witnesses, there was inadmissible expert testimony relating the characteristics of abused children to this child and improperly lending extra credence to the doctor's own fresh complaint testimony; there was the unnecessary second level hearsay statement of the grandmother. In these circumstances, definitive instructions as to the limits of fresh complaint testimony were crucial. Instead, no instructions were given as the testimony came in, and those that were finally

---

[11]Before this opinion was released, the Commonwealth and the defendant were given the opportunity to brief the judge's charge on fresh complaint.

delivered were not only insufficient but confusing on the essential point.[12]

6. *Other claims of the defendant.* We mention briefly those claims of the defendant not previously discussed which are likely to arise on retrial.[13]

(a) The defendant argues that the indictments should have been dismissed because the grand jury were not informed of the vicious and ongoing dispute revolving around the child's custody and visitation and that the mother's previous accusations had not been proven. There was no error. Prosecutors are not required to reveal all exculpatory evidence to a grand jury. *Commonwealth* v. *Lavelle*, 414 Mass. 146, 150 (1993). Moreover, the grand jury heard evidence that the husband stated that the accusations were made because of a divorce action, that they had also been made two or three years before and had been "unsubstantiated." Even if more detail should have been given, there is here no showing that the prosecution knowingly deceived or misled the grand jury or failed to disclose evidence which would "greatly undermine the credibility of evidence likely to affect the grand jury's decision to indict." *Id.,* citing *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985). See also *Commonwealth* v. *Fleury*, 417 Mass. 810, 816-817 (1994).

(b) There was no error in permitting the child to refer to an anatomically correct doll or in allowing the doll to go to the jury. Cf. *Commonwealth* v. *Reid*, 400 Mass. 534, 540 (1987); *Commonwealth* v. *Snow*, 30 Mass. App. Ct. 443, 444 (1991). A judge has considerable discretion in permitting photographs or other visual aids, *Commonwealth* v.

---

[12]In fairness to the trial judge, we note that *Commonwealth* v. *Licata*, 412 Mass. 654 (1992), and *Commonwealth* v. *Scanlon*, 412 Mass. 664 (1992), were decided subsequent to the trial.

[13]Because we are reversing the conviction, we need not reach the claim of prosecutorial misconduct. The incidents are not likely to arise at retrial. We note that the episode emphasized on appeal — calling the defendant a liar — was immediately addressed with strong curative instructions. But see *Commonwealth* v. *Murchinson*, 418 Mass. 58, 60-61 (1994). We also note there was no error in the judge's charge on indecent assault and battery. See *Commonwealth* v. *Perretti*, 20 Mass. App. Ct. 36, 43-44 (1985). Cf. *Commonwealth* v. *De La Cruz*, 15 Mass. App. Ct. 52, 59 (1982).

*MacDonald*, 368 Mass. 395, 400 (1975), and to decide whether they may go to the jury room. *Commonwealth* v. *Walter*, 10 Mass. App. Ct. 255, 263-264 (1980).

The judgment is reversed, the verdict set aside, and the case is remanded for a new trial.

*So ordered.*