909 P.2d 647

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Kelly PARKINSON, Defendant–Appellant.**

No. 20880.

Court of Appeals of Idaho.

Jan. 3, 1996.

W. Brent Eames, Madison County Public Defender, Rexburg, for appellant.

Alan G. Lance, Attorney General; L. Lamont Anderson, Deputy Attorney General (argued), Boise, for respondent.

LANSING, Judge.

Kelly Parkinson was convicted for sexual abuse of a child under sixteen, I.C. § 18–1506. By this appeal we are asked to determine whether the district court erred in excluding testimony by defense witnesses that

Parkinson's characteristics do not match sex offender profiles and testimony regarding the incidence of false reporting of sexual abuse. Parkinson also challenges the court's admission of certain hearsay testimony and the victim's testimony that Parkinson had beaten his wife. We also consider Parkinson's contention that the State's evidence was insufficient to support the jury's guilty verdict.

## I.

## FACTS AND PROCEEDINGS

According to the testimony at Parkinson's trial, the following events gave rise to the charge that he sexually abused a minor under the age of sixteen. On March 28, 1992, Parkinson's thirteen-year-old niece, E.F., and her brother, B.F., who was then age twelve, spent the night at Parkinson's home. E.F., her brother and her cousin, were sleeping in a downstairs bedroom. E.F. slept in a bed while her brother and cousin slept on the floor nearby. E.F. testified that there were three incidents of abuse during the night. During the first occurrence, she awoke to find Parkinson rubbing her buttocks. She jumped up and Parkinson left the room. Approximately two hours later, E.F. was awakened by Parkinson rubbing her breast and pulling at her nightgown. She rolled over in her bed, and Parkinson again departed. At about 6:30 a.m., E.F. was disturbed a third time by Parkinson, who was then rubbing her buttocks. Parkinson left after E.F.'s brother began to stir. E.F. woke her brother and, while crying, told him about the incidents that had occurred during the night. On March 31, 1992, E.F. told her mother about Parkinson's actions, and the police were contacted soon thereafter. Parkinson was charged with violation of I.C. § 18-1506, and was found guilty following a jury trial.

On appeal, Parkinson presents a number of issues for our consideration. He asserts that the court erred in several evidentiary rulings including: (1) the exclusion of expert testimony of a psychologist and of a former FBI investigator that Parkinson did not fit the profile of a sex offender; (2) exclusion of the psychologist's testimony about the fre-

quency with which children's accusations of sexual abuse are found to be false; (3) the admission of B.F.'s testimony about what E.F. told him regarding the abuse; (4) the admission of E.F.'s testimony to the effect that she did not like Parkinson because she believed he had beaten her aunt; and (5) the admission of a Department of Health and Welfare sexual abuse investigative record. Finally, Parkinson alleges that insufficient evidence was presented at trial upon which a rational trier of fact could have found him guilty of sexual abuse of a child. We address each assignment of error in turn.

## II.

## TESTIMONY REGARDING SEX OFFENDER PROFILES

Parkinson complains that the trial court erred when it excluded sex offender profile testimony offered through Marcel Chappuis, a psychologist, and Peter M. Welsh, a former Federal Bureau of Investigation agent with experience in the development of sex offender profiles for use by law enforcement personnel. Prior to trial, Parkinson filed a motion to allow Dr. Chappuis and Mr. Welsh to testify to their opinions that Parkinson did not fit the profile of a sexual offender. The district court denied Parkinson's motion, concluding that: (1) the profile evidence was offered to bolster Parkinson's credibility and was thus impermissible because veracity is not a "fact in issue" subject to expert opinion; (2) the evidence at issue would not "assist the trier of fact to understand the evidence"; and (3) the expert opinion evidence would constitute a direct comment on the guilt or innocence of Parkinson and replace, rather than aid, the jury's function.

At trial, however, Parkinson made offers of proof by questioning Dr. Chappuis and Mr. Welsh. By these offers of proof Parkinson sought to establish a foundation for the opinion testimony of both of these witnesses. The district court ruled that an adequate foundation had not been made for either Dr. Chappuis or Mr. Welsh to render opinions that Parkinson did not fit the profile of a sex offender, and also adhered to its earlier ruling that such opinion testimony based upon

profiles is inadmissible because it invades the province of the jury.

We note, as did the district court, that the introduction of expert testimony regarding whether a defendant fits an alleged "sexual offender profile" has been almost universally rejected in other jurisdictions. *See United States v. Pierre*, 812 F.2d 417 (8th Cir.1987); *State v. Person*, 20 Conn.App. 115, 564 A.2d 626 (1989), *aff'd*, 568 A.2d 796 (1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 756, 112 L.Ed.2d 776 (1991); *Gilstrap v. State*, 215 Ga.App. 180, 450 S.E.2d 436 (1994); *People v. Edwards*, 224 Ill.App.3d 1017, 167 Ill.Dec. 54, 586 N.E.2d 1326 (1992); *State v. Armstrong*, 587 So.2d 168 (La.Ct.App.1991); *Commonwealth v. Trowbridge*, 36 Mass.App.Ct. 734, 636 N.E.2d 291 (1994) *overruled on other grounds, Commonwealth v. Trowbridge*, 419 Mass. 750, 647 N.E.2d 413 (1995); *State v. Fitzgerald*, 382 N.W.2d 892 (Minn.Ct.App. 1986); *State v. Elbert*, 831 S.W.2d 646 (Mo. Ct.App.1992); *People v. Berrios*, 150 Misc.2d 229, 568 N.Y.S.2d 512 (N.Y.Sup.Ct.1991); *State v. Gallup*, 98 Or.App. 211, 779 P.2d 169 (1989); *State v. Campbell*, 904 S.W.2d 608 (Tenn.Crim.App.1995); *Williams v. State*, 649 S.W.2d 693 (Tex.Ct.App.1983); *State v. Hulbert*, 481 N.W.2d 329 (Iowa 1992); *Pendleton v. Commonwealth*, 685 S.W.2d 549 (Ky.1985); *State v. Cavaliere*, 140 N.H. 108, 663 A.2d 96 (1995). Various reasons have been given for rejection of this type of evidence, including that it has not gained general acceptance in the scientific community, that it invades the province of the jury and unfairly prejudices the prosecution, and that it does not assist the trier of fact to understand the evidence or to determine a fact in issue.[1]

Parkinson contends, however, that the Idaho Supreme Court determined such profile evidence to be admissible in *State v. Hester*, 114 Idaho 688, 694, 760 P.2d 27, 33 (1988), where the Court stated, "If relevant, it is generally permissible for experts to testify regarding traits typically exhibited by child abusers." The question addressed in *Hester* was whether the trial court had erred in allowing the *State* to introduce expert testimony that the defendant exhibited character traits consistent with characteristics of known child abusers. The Court held that this expert testimony was inadmissible because I.R.E. 404 prohibits the admission of evidence of a person's character if offered during the State's case in chief to prove the accused's conduct on a specific occasion. *Id.* at 694, 760 P.2d at 33. Thus, the *Hester* case presented no issue as to the admissibility of sex offender profile evidence offered by the *accused*, and any statement in the *Hester* opinion suggesting that such evidence is admissible in circumstances where it is not prohibited by I.R.E. 404 appears to be dicta.

Resolution of the case before us does not require, however, that we determine the precedential value of this statement in *Hester* or that we announce any general rule regarding the admissibility of sex offenders' profiles when offered by a defendant. We conclude that even if such evidence is generally permissible, the district court correctly held that an inadequate foundation for the expert testimony was presented in Parkinson's case.

■ Whether a witness is sufficiently qualified as an expert is a matter largely within the sound discretion of the trial court. *State v. Winn*, 121 Idaho 850, 828 P.2d 879 (1992); *State v. Crea*, 119 Idaho 352, 355, 806 P.2d 445, 448 (1991). Similarly, the admissibility of expert opinion testimony is discretionary and will not be disturbed on appeal absent a showing of an abuse of discretion. *Winn*, 121 Idaho at 855, 828 P.2d at 884; *Crea*, 119 Idaho at 355, 806 P.2d at 448. Thus, it is not error for a trial court to exclude from evidence testimony dealing with a scientific theory for which an adequate foundation has not been laid. *See Winn*, 121 Idaho at 855–56, 828 P.2d at 884–85.

Myers et al., *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb.L.R. 1, 139, 143–44 (1989); William D. Murphy and James M. Peters, *Profiling Child Sexual Abusers, Psychological Considerations*, 19 CRIMINAL JUSTICE AND BEHAVIOR 24 (1992).

---

1. Although we do not rely upon it for our decision, we also observe that the literature discussing the many methods of psychological assessment used to evaluate sex offenders indicates that there is no psychological test or combination of tests that can determine whether a person has engaged or will engage in deviant sexual activity.

Recent decisions of the Idaho Supreme Court establish that the admission of expert testimony · regarding scientific evidence is governed by Idaho Rule of Evidence 702. *State v. Gleason,* 123 Idaho 62, 65, 844 P.2d 691, 694 (1992); *State v. Rodgers,* 119 Idaho 1047, 1049, 812 P.2d 1208, 1210 (1991).[2] Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise."

■ Although our Supreme Court has held that this rule presents the appropriate test for measuring scientific reliability, that Court has not had occasion to articulate the inquiry envisioned by Rule 702. Therefore, for guidance we look to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), where the United States Supreme Court interpreted Federal Rule of Evidence 702, which is identical to I.R.E. 702. First, the Court held that the "general acceptance" test of *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), was superseded by the Federal Rules of Evidence, and thus general acceptance in the scientific community is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence. 509 U.S. at 585, 113 S.Ct. at 2793, 125 L.Ed.2d at 479. Second, the Court concluded that F.R.E. 702 places appropriate limits on the admissibility of evidence that is purportedly scientifically based by assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable scientific foundation and is relevant to the task at hand. *Id.* at 587–93, 113 S.Ct. at 2794–96, 125 L.Ed.2d at 480–82. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. at 2796–97, 125 L.Ed.2d at 482. Noting that the inquiry

is a flexible one, the Court then outlined a number of factors to be considered when evaluating whether the underlying reasoning or methodology is scientifically valid. These factors include whether the theory or technique in question can be tested, whether it has been subjected to peer review and publication, its known or potential error rate, the existence and maintenance of standards governing its use, and whether it has attracted widespread acceptance within a relevant scientific community. *Id.* at 592–95, 113 S.Ct. at 2796–98, 125 L.Ed.2d at 482–484. The Court concluded by noting that the overarching subject of the inquiry "is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id.* at 593–95, 113 S.Ct. at 2797–98, 125 L.Ed.2d at 484.

■ Other courts and commentators have used these same factors in analyzing proposed scientific evidence and have suggested additional factors, including: (1) the presence of safeguards in the technique; (2) analogy to other scientific techniques whose results are admissible; (3) the nature and breadth of inferences drawn; (4) the extent to which the basic data are verifiable by the court and jury; (5) availability of other experts to test and evaluate the technique; (6) the probative significance of the evidence in the circumstances of the case. *See* James M. Peters and William D. Murphy, *Profiling Child Sexual Abusers, Legal Considerations,* 19 CRIMINAL JUSTICE AND BEHAVIOR 38, 41 (1992). In light of these concerns we examine the testimony at issue in this appeal.

■ We first address the offer of testimony by Dr. Chappuis that, in his opinion, Parkinson did not fit the psychological profile of sex offenders. Dr. Chappuis based his opinion on the results of an evaluation format which included the Minnesota Multiphasic Psychological Inventory (M.M.P.I.), a suicide risk assessment instrument and clinical interviews. The substance of Dr. Chappuis's testimony can be fairly characterized as follows: (1) the M.M.P.I., a generally accepted and widely used personality test, was adminis-

---

**2.** In these cases the Court expressly rejected the "general acceptance within the scientific community" test enunciated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), as the standard for admission of scientific evidence. *See Gleason,* 123 Idaho at 65, 844 P.2d at 694; *Rodgers,* 119 Idaho at 1049, 812 P.2d at 1210.

tered to Parkinson; (2) a clinical interview was conducted with Parkinson; and (3) as a result of that test and interview, Dr. Chappuis was of the opinion that Parkinson did not fit the profile of a sexual offender. We conclude that there was no showing of the reliability of Dr. Chappuis's assessment technique sufficient to meet standards for admission of the testimony under I.R.E. 702. Although Dr. Chappuis testified that the M.M.P.I. is a standard and accepted psychological test, he presented no testimony from which it could be determined that the sex offender profile which Dr. Chappuis drew from that test, other tests, and clinical interviews had scientific validity or was reliable for the purpose for which it was offered in this case. For example, Dr. Chappuis did not: describe the personality or psychological characteristics that made up the profile; describe the methodology by which the profile was derived; state whether or how the technique had been tested; describe the profile's level of accuracy in distinguishing between offenders and non-offenders; or state whether the profile and the assessment technique utilized by Dr. Chappuis had attracted widespread acceptance within the psychological community. While we do not hold that evidence on each one of these points is essential to an adequate foundation for evidence of this type, the absence of evidence on *any* of these considerations prevents a conclusion that the proffered testimony would "assist the trier of fact to understand the evidence or to determine a fact in issue" as required for admission under I.R.E. 702.

█ Mr. Welsh's proffered testimony suffers from similar defects in foundation. Mr. Welsh acknowledged that the F.B.I. sex offender profile which he utilized was developed for use by law enforcement officials and that its application was more of an art than a science. He did not identify the components of the profile or explain how it was developed, other than noting that its development involved interviews with convicted sex offenders. Mr. Welsh did not state whether or how the resulting profile had been tested for accuracy or identify the technique's error rate. Although Mr. Welsh testified that the profile is widely used in the law enforcement community, it is not apparent whether that

use is primarily for devising profiles of perpetrators of unsolved crimes or for the purpose for which it was offered in the present case—to determine whether an accused identified by the alleged victim did in fact commit the crime. In short, Mr. Welsh's testimony did not provide information from which it could reasonably be ascertained that the profile technique was trustworthy, that it was based upon valid scientific principles, or that it could properly be applied in the manner advocated by Parkinson. Therefore, the trial court did not abuse its discretion by excluding Mr. Welsh's testimony.

## III.

## EVIDENCE REGARDING THE INCIDENCE OF FALSE SEXUAL ABUSE ACCUSATIONS

█ In an offer of proof, Dr. Chappuis was asked by defense counsel for his opinion "as to the general incidence of fabrications with regard to sexual allegations made by minors." Dr. Chappuis responded that in approximately twenty-five to thirty percent of the cases his office was involved in, the allegations were false. This opinion on the statistical incidence of false accusations of sexual abuse was based only on anecdotal information derived from Dr. Chappuis's personal experience as a therapist in Sandy, Utah, and as consultant to the Utah court system. Any potential inference of scientific reliability is belied by the very narrow information base and the lack of any scientific methodology underlying this estimate. Most importantly, Dr. Chappuis stated that he based his determination of which allegations were "false" upon the outcome of court proceedings against the accused perpetrator. "I assume if someone is acquitted or found innocent, then they are innocent," he said. The unreliability of Dr. Chappuis's estimate is patent. As the Idaho Supreme Court stated in *State v. Schwartzmiller*, 107 Idaho 89, 92, 685 P.2d 830, 833 (1984), "A not guilty verdict, standing by itself, can never be taken to establish that the charges brought were based on false allegations, since one may not be convicted of a crime unless a jury finds ·

beyond a reasonable doubt the guilt of the defendant."

Although Dr. Chappuis also alluded to national research that estimated the range of false allegations to be between five and thirty percent of all sex abuse accusations, there was not evidence of the methodology used in those studies from which an indicia of reliability could be drawn, and the very breadth of the range from five percent to thirty percent suggests a lack of accuracy and trustworthiness. The record is conspicuously lacking any explication of disciplined inquiry and methodology that would support Dr. Chappuis's testimony on the incidence of false accusations of sexual abuse. The trial court correctly excluded this evidence for lack of adequate foundation under I.R.E. 702.

## IV.

### BROTHER'S TESTIMONY REGARDING THE VICTIM'S STATEMENT

Parkinson next asserts that the court erred by admitting testimony of the victim's brother, B.F., about the victim's statements to him in the early morning hours following the sexual abuse. B.F. testified that he was wakened by E.F., who was crying and "very upset." She told him that Parkinson had come into the room three times and touched her "butt" and her breasts. Defense counsel objected to B.F.'s testimony as inadmissible hearsay. The court ruled that, although the testimony at issue was hearsay, it fell within the excited utterance exception to the I.R.E. 802 rule of hearsay exclusion.

 Idaho Rule of Evidence 803(2) provides that hearsay will be admissible if the out-of-court declaration was a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." This hearsay exception has two requirements: First, there must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of an observer. Second, the statement must have been the declarant's spontaneous reaction to the occurrence or event and not the result of reflective thought. *State v. Parker*, 112 Idaho 1, 4, 730 P.2d 921,

924 (1986); *State v. Stover*, 126 Idaho 258, 263, 881 P.2d 553, 558 (Ct.App.1994). Whether a statement falls within this "excited utterance" exception is a question that is committed to the sound discretion of the trial court. *State v. Bingham*, 116 Idaho 415, 421, 776 P.2d 424, 430 (1989); *Stover*, 126 Idaho at 262–63, 881 P.2d at 557–58.

 In the case before us, there were three events of sexual abuse of a young girl, who related the details of the abuse to her brother only a few minutes after the last incident had occurred. B.F. testified that as E.F. recounted what had happened, she was in tears and appeared to be distraught. Upon this evidence, the trial court could properly conclude that there was an adequate showing that the victim was under the stress of a startling event and that her statement was a spontaneous reaction made without reflective thought. We find no abuse of discretion in the trial court's decision allowing B.F.'s testimony.

## V.

### TESTIMONY THAT PARKINSON BEAT HIS WIFE

 During cross-examination of E.F., in an apparent effort to show a motive for her to fabricate her allegations, defense counsel asked E.F. about her dislike of Parkinson. The following exchange occurred:

Q. You didn't like Parkinson before that Saturday night, did you?

A. Not very much.

Q. Not very much or not at all?

A. Not very much.

Q. Because . . .

A. Because of what he did to my aunt.

Defense counsel: Your Honor, I move to strike that answer as not responsive.

The Court: Not at all. You opened the door to it. You asked the question and she answered. If you don't want her to go into that matter, don't ask the question.

On redirect, the prosecutor pursued this subject. After objections by Parkinson were overruled, the redirect examination proceeded as follows:

Q. What did he do that made you not like him?

A. He beat my aunt.

Q. Do you have any personal observations that would lead you to know that or figure that out?

A. Yes. I saw her quite a few times with bruises.

The court then instructed the jury that this testimony was not admitted to establish the truth of the allegations concerning Parkinson's treatment of his wife, but that it was admitted solely for the purpose of allowing E.F. to explain why she did not like Parkinson.

Parkinson argues that this was character evidence or "other crimes" evidence that was inadmissible under I.R.E. 404. That rule restricts the use of evidence of a person's character and precludes evidence of other crimes, wrongs, or acts to show that the individual acted in conformity therewith. We conclude that these provisions of Rule 404 are inapplicable, however, because E.F.'s testimony that Parkinson beat his wife was not offered by the State to show that Parkinson "acted in conformity therewith." Rather, it was offered to explain why E.F. did not like Parkinson and to rehabilitate her after an imputation of bias during cross-examination. The issue as to E.F.'s dislike of Parkinson and her reason for this disfavor was introduced by Parkinson's cross-examination of E.F., and the inquiry by the State was therefore relevant to an issue other than Parkinson's character.

## VI.

### ADMISSION OF THE HEALTH AND WELFARE RECORD

■ Parkinson contends that the district court improperly admitted into evidence a record prepared by Ms. Garner, a child protection investigator employed by the Idaho Department of Health and Welfare. The record documents the initial telephone call by which E.F.'s mother reported the molestation. Testifying for the State at trial, Ms. Garner said that she had prepared this "referral sheet" as a record of the telephone report made by E.F.'s mother. During

cross-examination, in order to show inconsistencies between the report to Ms. Garner and E.F.'s testimony at trial, Parkinson's attorney asked Ms. Garner whether the referral sheet said anything about Parkinson removing the victim's nightgown. Ms. Garner answered, "Yes. It is on here." The prosecutor then moved for admission of the entire report, which was admitted over Parkinson's hearsay objection. On appeal, the State concedes that the document was inadmissible hearsay, but submits that its admission was harmless error. Erroneously admitted evidence is harmless if the appellate court is able to say, beyond a reasonable doubt, that the jury would have reached the same result absent the error. *State v. Boman*, 123 Idaho 947, 950–51, 854 P.2d 290, 293–94 (Ct.App.1993); *State v. Brazzell*, 118 Idaho 431, 435, 797 P.2d 139, 143 (Ct.App. 1990).

■ Parkinson argues, however, that a statement on the referral sheet was prejudicial. The report indicates that Parkinson's wife "knows [Parkinson] went downstairs several times." This statement was not mentioned during the trial but could have been read by the jurors when they reviewed exhibits during deliberations. Since Parkinson's wife did not testify, and there was no other evidence that she was aware Parkinson had gone into the children's room several times in the night, Parkinson argues that this hearsay was harmful. Taken in context, however, we conclude that, if this statement was seen by the jurors, they would not have understood it to be an acknowledgement of information by Parkinson's wife. It was clear from Ms. Garner's testimony that the report was only a summary of a single telephone conversation between Ms. Garner and the victim's mother. It is apparent from this testimony that the statement in the report about what Parkinson's wife allegedly knew could only have been the speculation of E.F.'s mother and not information from Parkinson's wife. Further, police officers testified that Parkinson admitted to them that he went downstairs and into the children's room once while the children were sleeping, and that he was otherwise out of his bed several times during the night. Considering the to-

**38**

tality of the evidence, we are persuaded beyond a reasonable doubt that the exclusion of this statement on the referral sheet would not have led to a different verdict. Therefore, we hold that the erroneous admission of the Health and Welfare record was harmless error.

## VII.

### SUFFICIENCY OF THE EVIDENCE

Parkinson's final contention is that the State did not meet its burden of proving beyond a reasonable doubt that he had sexual contact with his niece or that any physical contact that occurred was done with the intent to gratify sexual desire as required by Idaho Code § 18–1506(1).

▮▮▮▮▮ A jury's verdict will not be set aside if there is substantial evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. A jury is entitled to draw any reasonable inferences from the evidence presented. On appeal, the evidence is viewed in the light most favorable to the prosecution, and the reviewing court is precluded from substituting its judgment from that of the jury as to the credibility of the witnesses, the weight of the evidence and the reasonable inferences to be drawn from the evidence. *State v. Filson,* 101 Idaho 381, 613 P.2d 938 (1980); *State v. Peite,* 122 Idaho 809, 839 P.2d 1223 (Ct.App.1992).

▮▮▮ Substantial evidence supports the verdict in this case. E.F.'s testimony was corroborated by her brother, who testified about E.F.'s distress in the morning immediately following the abuse. The State also placed in evidence Parkinson's admissions to police officers that he had left his bed in the middle of the night and had gone to the room where the children were sleeping. Although Parkinson consistently denied having touched E.F. inappropriately, he was inconsistent in his separate statements to two police officers, telling one that E.F. never awakened or stirred while he was in the room, and telling the other that E.F. did wake up and push him away when he was arranging the covers on her bed. Direct evidence as to intent is not required. *State v. Bronson,* 112 Idaho 367, 732 P.2d 336 (Ct.App.1987). "[I]t is sufficient to show ... intent by circumstantial evidence ... 'One's intent may be proved by his acts and conduct, and as such is the usual and customary mode of proving intent.'" *Id.,* at 369, 732 P.2d at 338, *quoting Ex Parte Seyfried,* 74 Idaho 467, 470, 264 P.2d 685, 687 (1953). E.F. testified that Parkinson came to her bed on three separate occasions, each time fondling either her buttocks or her breast. A rational jury could infer from this evidence that Parkinson committed the acts against E.F. with the intent to gratify sexual desire.

## VIII.

### CONCLUSION

We find no error in the trial court's exclusion of evidence offered by Parkinson regarding sex offender profiles and the frequency of false allegations of sexual abuse. We also conclude that the district court did not err in allowing the State to introduce E.F.'s testimony that Parkinson beat his wife. Although the district court erred in admitting the Department of Health and Welfare record over Parkinson's hearsay objection, we find this error to be harmless beyond a reasonable doubt. The evidence was sufficient to support the jury's findings as to the occurrence of sexual contact and as to Parkinson's intent. The judgment of conviction is therefore affirmed.

WALTERS, C.J., and PERRY, J., concur.