UNITED STATES, Appellee,

v.

Gary Q. DIMBERIO, Senior Airman,
U.S. Air Force, Appellant.

No. 00–0166.
Crim.App. No. 33091.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 4, 2000.

Decided Sept. 28, 2001.

CRAWFORD, C.J., delivered the opinion of the Court, in which GIERKE and BAKER, JJ., joined. SULLIVAN, J., filed an opinion concurring in the result. EFFRON, J., filed a dissenting opinion.

For Appellant: *Captain Patience E. Schermer* (argued); *Lieutenant Colonel James R. Wise* and *Major Stephen P. Kelly* (on brief).

For Appellee: *Major Bryan T. Wheeler* (argued); *Colonel Anthony P. Dattilo, Lieutenant Colonel Ronald A. Rodgers* (on brief).

Chief Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas appellant was convicted by military judge alone of assault with means likely to produce grievous bodily harm. The convening authority approved the sentence of a bad conduct discharge, nine months' confinement, total forfeitures and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 52 MJ 550 (1999). We granted review of the following issue:

> WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY REFUSING TO ADMIT CONSTITUTIONALLY REQUIRED DEFENSE EXPERT EVIDENCE FROM A FORENSIC PSYCHIATRIST ABOUT AN ALTERNATIVE PERPETRATOR THAT WAS AN INDISPENSIBLE ELEMENT OF APPELLANT'S DEFENSE, EVIDENCE WHICH SHOULD MOST CERTAINLY HAVE BEEN ADMITTED UNDER EXISTING MILITARY LAW AND WHICH WOULD HAVE MOST CERTAINLY BEEN ADMITTED IN MANY OTHER FEDERAL AND STATE COURTS.

## FACTS

Appellant's wife brought their newborn (4 week old) son, Jarod, to the emergency room of United Hospital in the civilian community at about 7:30 a.m. on the morning of February 3, 1997. Jarod was seen by Dr. Richard Wacksman, a critical care physician, who tes-

tified that he observed severe trauma to the child including bruises to the nose and extensive retinal hemorrhages (R. 219–223). Jarod's skull contained a subdural hematoma and his brain continued to swell after admission (R. 224, 231). Dr. Wacksman testified that there was no medical cause for the injuries and that they were consistent with "non-accidental injury." (R. 239).

LtCol. (Dr.) Gael Lonergan, a pediatric radiologist, testified that an examination of the computerized topography scans of Jarod's brain showed a large amount of blood in the brain, a level normally only seen in serious automobile accidents (R. 452). Dr. Lonergan testified that the child's injuries were so serious that the brain had atrophied. Based on her review of the record of the CAT scans she concluded that Jarod had been violently shaken (R. 454).

Appellant's wife, Nicole, testified that the night of 2–3 February, 1997 she had some friends in for a party. This was the first time she or her husband had entertained friends following the birth of Jarod on 6 January 1997. This party continued most of the night. Nicole testified that at about 10:00 p.m. she had put Jarod to bed and fed him a bottle (R. 156). The child was sleeping in the same bed that she and her husband used (R. 154–155). She also testified that sometime between 12:30 a.m. and 2:30 a.m. she heard Jarod crying. She went upstairs, changed his diaper and fed him a bottle (R. 163). Jarod did not take his bottle well. Mrs. Dimberio then "propped"[1] the bottle and left the child so she could return to her company (R. 164). This took no more than 15 minutes (R. 165)

Appellant did not testify on the merits. Therefore the chronology of his movements is established through the testimony of other witnesses. That evidence established that appellant went to bed sometime between 12:30 a.m. and 4:30 a.m., but clearly after his wife had fed the child a second time (R. 111, 165 349, 392). He was tired from being in

---

1. Nicole Dimberio explained that by "propping" the bottle, she meant that she placed the child in

the bed and left the bottle so he could nurse it without assistance.

the field and had consumed no alcohol during the evening (R. 157, 346 359).

No one heard anything further from the child until sometime between 5:30 and 6:30 a.m. All of the witnesses testified Jarod began to cry loudly about that time. (R. 111, 523). In fact the crying was so strong that it caused Mrs. Dimberio to begin to lactate although she had stopped nursing the child several days before (R. 173).[2] One of the guests testified that the crying was originally like "a newborn's cry" but that it quickly became a hysterical cry (R. 395).

Nicole went upstairs and found dried blood and abrasions on the child's face (R. 115). Appellant told her that he had rolled over on the child (R. 117). No one in attendance at the party could recall seeing the injuries prior to that time (R. 320, 323, 361, 384). One of the guests testified that when Nicole brought the child downstairs she observed blood on the child's nose and on the collar of his shirt (R. 354, 358, see also R. at 400).

Mrs. Dimberio testified that she quickly brought the child downstairs. She called the base hospital but received no response. She then called the civilian hospital (United) and spoke with a Dr. Bock (R. 175–177). While Dr. Bock indicated there was no cause for alarm, Mrs. Dimberio thought she should take the child to the hospital. Appellant told his wife that she was overreacting (R. 177). Nicole insisted and a friend, AMN Beck, drove her and the child to the hospital (R. 178). Appellant did not accompany them, saying that he needed to attend to the family dog, who had been outside in the subzero temperature and could not be found before the trip was made to the hospital. R. 191. But he did go to the hospital later (R. 115, 521).

Mr. Ramberg, Chief Investigator for the Grand Forks County Sheriff's Department, testified that he arrived at United Hospital about 10:15 a.m. At about 11:30 a.m. he interviewed Nicole Dimberio, and he then interviewed appellant (R. 102, 109–110). He did not warn appellant of his rights as appel-

lant was not a suspect at that time (R. 110). During this interview, appellant merely related that he went to bed about 12:30 a.m. because he was tired and not feeling well (R. 111). He woke up about 6:00 a.m. when his baby began to cry (R. 111). Appellant told Mr. Ramberg that he picked the child up and tried to feed it. However, the child would not take a bottle and continued to cry. At that point Nicole came into the room and turned on the light. This was the first time that appellant saw any blood on the child. He told Mr. Ramberg that he may have rolled over on the child during the night (R. 112).

Two days later, appellant was again interviewed at a different hospital in Fargo, North Dakota, by Investigator Ramberg. Also present at this interview was OSI Agent Gallegos. Appellant was read and waived his Article 31 UCMJ, 10 USC § 831 rights. At this interview appellant said he was awakened when the baby started crying. He remembered putting his forearm against the child to keep him (appellant) upright while he checked the baby. According to appellant this pressure on the baby lasted for about 5 seconds. (R. 114.) Prior to this second interview on February 5, appellant had been told that "rolling over on the child would not cause brain damage." (R. 115.) Although appellant continued to maintain he could have rolled over on the baby during the night, he now admitted to putting a forearm on the back of Jarod's head and applying pressure (R. 118). At no point during either interview with Investigator Ramberg did appellant indicate that he thought his wife may have been the cause of Jarod's injuries (R. 117).

At some point prior to trial, appellant's defense counsel learned that Nicole Dimberio had a history of treatment for various mental health issues. Defense counsel requested, and the military judge granted, the appointment of an expert to assist the defense in reviewing Mrs. Dimberio's medical records. This expert, Dr. Sharbo, concluded that Mrs.

---

**2.** Appellant and his wife had a baby monitor in the room so the child's crying was heard by their guests who were downstairs.

Dimberio suffered from an unspecified personality disorder with narcissistic, histrionic, and borderline traits. (App. Ex. XXXV at 9.) He also found that Nicole suffered from stress and on occasion would act without thinking. Importantly, he did not find, nor did the defense contend, that Nicole was likely to act out violently or had a history of such actions.

At trial on October 21, 1997, defense counsel made a proffer that experts in the field of psychiatry would testify that an individual who has "anger control and stress control issues" might shake a baby. R. 48. "[S]haken baby syndrome ... is due to a momentary loss of control due to stress [on] the care giver." *Id.* "The stress related factors can be anything, either involving the child itself or external stress related factors that are going on in the care giver's life at that particular time." *Id.* The defense requested that

> Dr. Wacksman and other experts in the field ... testify about that shaken baby syndrome and their experience of the cause as it is the result of stress and typically is not a premeditated event. I think that is relevant to go to the state of mind of the accused and the issue on the specific intent to grievously injure his son. *Id.*

After some questioning, the military judge ascertained that the linkage between the above proffered testimony and the accused was that defense counsel intended to introduce character evidence that appellant was a peaceful individual and calm in stressful situations. R. 49. See also R. 461, 471, 478–79. According to the defense theory, testimony that shaken baby syndrome was generally not a premeditated act, coupled with appellant's character evidence, would negate the specific intent requirement of the charged aggravated assault. After additional discussion, defense counsel revealed that another purpose behind its desire for expert testimony was to admit the psychological history of Nicole Dimberio under Mil.R.Evid. 404(b). R. 52. In support of this position, counsel introduced the legislative history behind Fed. R.Evid. 413–15, and an article on the subject. App. XXXII.

At a conference more than a day later, defense counsel offered Appellate Exhibit XXXV which was styled as a supplemental funding request for forensic psychiatrist David A. Sharbo and a request to appoint Dr. Sharbo as an expert witness. A part of this appellate exhibit was a two-page memorandum written by Dr. Sharbo as a result of his examination of Nicole Dimberio. He found:

Diagnoses:

    Axis II: Personality Disorder, NOS with narcissistic, histrionic and borderline traits

    Axis I: Alcohol Dependence, In Sustained Partial Remission, still drinking alcohol

    Axis I: Eating Disorder NOS with binge, purge & restriction, In Remission

1. Nicole Dimberio fully meets DSM IV diagnostic criteria for the above three mental disorders.

2. Narcissistic traits address pervasive patterns of grandiosity, need for admiration and lack of empathy.

3. Histrionic traits address patterns of excessive emotionality and attention seeking.

4. Borderline traits refer to patterns of instability in interpersonal relationships, self-image, affects and impulsivity.

5. She has a history of instability in nurturing relationships throughout her formative years. This is a contributing factor to difficulty maintaining healthy relationships in adult life.

6. Shifting back and forth between homes to meet her own desires while in school fostered subsequent impulsivity and difficulty in relationships.

7. Her previous history of poor impulse control and self destructive behavior includes eating disorder, alcoholism and suicide attempt by poisoning.

8. We have only her word for the amount she drank that night (2 beers.) Denial/minimization is characteristic of individuals with addictive disorders in general and alcoholism in particular.

9. This is an individual that would not be expected to handle stressful situations well.

App. Ex. XXXV.

This proffer and request by defense counsel for the admission of Dr. Sharbo's testimony in accordance with his two-page diagnosis, was actively opposed by the trial counsel. The military judge said he was not adverse to allowing expert testimony, but:

> There is no evidence, zero evidence, that she (meaning Nicole Dimberio) has acted out violently toward any baby. There is no evidence that she has acted out violently against her own baby. There is zero evidence that when she gets in a stressful situation that she acts out violently and it would be necessary in the court's opinion for you to have that connection and have that opinion in order to solicit this information. . . . I, quite frankly, see Nicole Dimberio, based on simply what I have heard in a courtroom, as certainly someone who meets a number of these characteristics; that she doesn't handle stressful situations well is pretty evident from listening to the testimony in terms of her reaction. But, what you are missing, in the court's opinion, is the connection between stressful situations and violence or the impulsivity and violence.

R. 500.

The military judge also found that the mere fact that Nicole may have yelled at someone under a stressful situation should be excluded under Mil.R.Evid. 403. *Id.* The judge also stated he would not allow an extrapolation of Nicole's different behavioral characteristics into testimony before the panel. R. 501.

Defense counsel responded that because shaken baby syndrome was not normally a premeditated act, the defense did not have to "show the link between stress and acting out and violence." R. 501. According to defense counsel, he merely had to show a link between the state of mind of Mrs. Dimberio through her impulsive personality traits with the expert testimony that the shaken baby syndrome negates a premeditated act. R. 502. In response the judge noted that if there had been evidence of violent acting out with children in the past, he would have entertained admitting the evidence pursuant to Mil.R.Evid. 402(b). R. 502–03. There was no evidence of such in this case.

## DISCUSSION

It is undeniable that a defendant has a constitutional right to present a defense. In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Court held that compulsory due process includes both the right to compel the attendance of defense witnesses and the right to introduce their testimony into evidence. In *United States v. Robinson*, 39 MJ 88, 89 (CMA 1994), this Court stated that the Equal Protection Clause, Due Process Clause, and the Manual for Courts–Martial each provide that service-members are entitled to expert assistance when necessary for an adequate defense. *United States v. Garries*, 22 MJ 288, 291 (CMA 1986).

However, the Constitution does not confer upon an accused the right to present any and all types of evidence at trial, but only that evidence which is legally and logically relevant. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Appellant seeks the admission of Dr. Sharbo's testimony under Mil.R.Evid. 401–405 and 702–703.

Rules 401–404 set forth what is legally and logically relevant. Rule 401 defines logically relevant evidence as "evidence . . . having any tendency and reason to prove or disprove any disputed fact that is of consequence to the determination of the action." However, even though the evidence is logically relevant, it may be excluded as not legally relevant if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay. . . ." Rule 403.

Rules 404 and 405 set forth rules concerning the introduction of character evidence including what constitutes proper character evidence and the mode the proof. What constitutes "character evidence"? "Character is a generalized description of a person's disposition, or of the disposition in respect to

a general trait, such as, honesty, temperance or peacefulness." McCormick on Evidence § 195 at 686 (5th ed.1999). Rule 404(a) provides in pertinent part "evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except as otherwise limited."

The Advisory Committee notes:

circumstantial use of character is rejected but with important exceptions: (1) an accused may introduce pertinent evidence of good character (often misleadingly described as "putting his character in issue"), in which event the prosecution may rebut with evidence of bad character; (2) an accused may introduce pertinent evidence of the character of the victim, as in support of a claim of self-defense to a charge of homicide or consent in a case of rape, and the prosecution may introduce similar evidence in rebuttal of the character evidence, or, in a homicide case, to rebut a claim that deceased was the first aggressor, however proved; and (3) the character of a witness may be gone into as bearing on his credibility. McCormick §§ 155–161. This pattern is incorporated in the rule. While its basis lies more in history and experience than in logic, an underlying justification can fairly be found in terms of the relative presence and absence of prejudice in the various situations. Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L.Rev. 574, 584 (1956); McCormick § 157. In any event, the criminal rule is so deeply imbedded in our jurisprudence as to assume almost constitutional proportions and to override doubts of the basic relevancy of the evidence.

The Advisory Committee notes, Rule 404.

Thus, this rule provides that circumstantial use of character evidence is impermissible except for the three exceptions noted above.[3]

Mil.R.Evid. 405(a) provides that, whenever "evidence of character or a trait of character of a person is admissible, proof may be made ... by testimony in the form of an opinion." While the commentators are divided whether the opinion testimony like that proffered by the defense implicates a character trait[4]. We will assume character evidence is broader than defined by McCormick and includes psychiatric diagnosis or personality disorders. Such evidence would not fit within the exceptions to Mil.R.Evid. 404(a). However, that does not answer the question because if the evidence is otherwise legally and logically relevant under Rules 401 through 403 the defendant has a constitutional right to introduce the evidence. However, in order for the evidence to be admissible, appellant has the burden of by making an adequate proffer or presentation of evidence. Mil.R.Evid. 103[5].

The "substance of the evidence" that was part of the proffer has to be made known or be "apparent from the context." Mil.R.Evid. 103(a)(2). This can be done through a stipulation, through direct examination, or through a proffer. In any event, any of those methods must encompass the foundational requirements. *See* Edward J. Imwinkelried, *Evidentiary Foundations* (2d ed.1989).

■ If part of a proffer is admissible and part inadmissible, the offering party must single out the admissible part, otherwise the evidence shall be held inadmissible. *Collins v. Seaboard Coast Line, R.R.,* 675 F.2d 1185, 1194 (11th Cir.1982); *Dente v. Riddell, Inc.,* 664 F.2d 1, 2 n. 1 (1st Cir.1981). Stated differently, if a party makes a proffer of evidence that is partly admissible and partly inadmissible without limiting the proffer, the party cannot complain on appeal if

---

**3.** Mil.R.Evid. 404(a)(2) is "taken from the Federal Rule with minor changes." Mil.R.Evid. 404(a)(2), Drafters' Analysis, Manual, *supra,* at 22–34. Mil.R.Evid. 404(a)(3) is the same as Fed. R.Evid. 404(a)(3). *Id.*

**4.** *See e.g., Weinstein, Federal Evidence,* § 405.04[2][c] at 405–28 through 405–29; C.

Mueller & L. Kirkpatrick, *Federal Evidence,* § 101 at 551–52 (2d ed.1994).

**5.** Taken from Fed.R.Evid. 103 "with a number of changes." Mil.R.Evid. 103, Drafters' Analysis, Manual for Courts–Martial, United States, 2000, at A22–2.

the court, as it did here, excludes the entire offer. *Paddack, et al. v. Christensen, et al.,* 745 F.2d 1254, 1260 (1984); *United States v. West,* 670 F.2d 675, 683 (7th Cir.1982); *United States v. Stout,* 667 F.2d 1347, 1353–54 (11th Cir.1982).

■ Rules such as Mil.R.Evid. 403 and 404(a) that exclude evidence from criminal trials do not abridge an accused's constitutional right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve. Evidence may be excluded even though of probative value if "its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." *Michelson v. United States,* 335 U.S. 469, 476, 69 S.Ct. 213, 93 L.Ed. 168 (1948). *See also Jaffee v. Redmond,* 518 U.S. 1, 9, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) ("sufficiently important interest" may outweigh right to present probative evidence); *United States v. Clemons,* 16 MJ 44, 50 (CMA 1983)(Everett, J., concurring)("In some situations there are strong public policies that favor excluding certain types of relevant evidence.").[6] To rise to the level of constitutional error, a ruling must have infringed upon a weighty constitutional interest of the accused. *See United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

Character may be proved by either reputation evidence,[7] opinion evidence[8] or evidence of specific instances of conduct.[9] Is the evidence admissible as character evidence under Rule 404(a)? If not, is it constitutionally required to be admitted? Or should it be admissible under the 700 rules?

■ The defense did not offer an appropriate foundation for the introduction of reputation or opinion type evidence. *United States v. Breeding,* 44 MJ 345, 350–51 (1996).

*See also United States v. Toro,* 37 MJ 313, 317 (CMA 1993); *United States v. Tomchek,* 4 MJ 66 (CMA 1977). Both lay and opinion evidence is admissible on personality traits. The expert in this case had not known Mrs. Dimberio long enough to have formed a traditional opinion as to her character or to have heard about her reputation in the community but could express an expert opinion as to the patient's mental condition. *Id.* Nor did the defense offer specific instances of conduct by Mrs. Dimberio. Thus, under Mil.R.Evid. 404–405, the evidence set forth in App. Ex. XXXV was inadmissible as the court below held, 52 MJ at 558–59.

Nor was there a sufficient proffer under Rules 401–405 and the 700 series. We normally think of these traits as traits that are relevant to the offense charged, that is honesty in a larceny case or law-abidingness in any case. However, the defense in this case seeks to introduce evidence, App. Ex. XXXV, as a mental disorder under the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV)(4th ed.1994). This evidence may very well be relevant if the defense establishes that individuals with certain diagnoses confronted with certain situations may respond in a similar consistent way. While circumstantial proof of conduct may very well be relevant, it has more complex inferential problems that require a sufficient basis in a first instance.

■ As to Mil.R.Evid. 702–703, Mil.R.Evid. 103, requires an adequate proffer as to expert testimony that includes the following:

1. Qualifications of the expert

2. The subject matter of the expert testimony

3. Basis for expert testimony

---

6. *Cf. Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)(Frankfurter, J., dissenting) ("Limitations are properly placed upon the operation of this general principle [society is entitled to every man's evidence] only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normal predominant principle of utilizing all rational means for ascertaining truth.").

7. Mil.R.Evid. 405(a). Same as the Federal Rule. *Id. See also Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

8. *Id.*

9. Mil.R.Evid. 405(b). Taken without change from Fed.R.Evid. 405(b). Mil.R.Evid. 405(b), Drafters' Analysis, Manual, *supra,* at 22–35.

4. Legal relevance of the evidence

5. Reliability of the evidence, and

6. Probative value of the testimony.

*See United States v. Houser*, 36 MJ 392, 397. *See also United States v. Griffin*, 50 MJ 278, 283 (1999), *United States v. Combs*, 39 MJ 288, 290 n. 1 (CMA 1994); *United States v. Banks*, 36 MJ 150, 161 (CMA 1992).[10] Assuming the qualifications of the expert, what is missing here is an adequate proffer that this evidence of Mrs. Dimberio's mental health problems had a nexus or link to behavioral traits of acting out and violence.

It is difficult to exempt biophysical facts from mental disorders. However, in any event the proponent must satisfy the *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), reliability standard. An unreliable test is not sufficiently legally relevant. The question is whether traits exist and whether they are manifested in certain situations. Like other scientific theories, the expert would have to show that these character traits do react similarly in certain situations satisfying the *Daubert* rules. Even an individual with certain characteristics may have internal self-monitoring which may or may not cause them to act similarly in various situations. Some legal scholars who have engaged in exhaustive research have even questioned the use of character evidence. Lawson, *Credibility in Character: A Different Look at an Indeterminable Problem*, 50 Notre Dame Law. 758 (1975). Appellant did not proffer evidence that a person with his wife's personality trait would act out in a violent manner.

The defense did not cite any case or rule that would have allowed the introduction of expert testimony concerning Mrs. Dimberio's condition and her likelihood of being the perpetrator. If, as the defense contends, that it is so apparent, then no evidence would be needed on the topic. However, this Court

has stressed over the years the six *Houser* steps that are a predicate to introducing expert testimony. The defense did not attempt to meet these steps.

■ If the defense had satisfied Rules 401–405 and 702–703, the evidence would still be inadmissible under 403's [11] balancing test.[12] In the absence of character evidence that Mrs. Dimberio's mental health was tied to violence, including prior violent acts, the introduction of a mental health diagnosis that she did not handle stress well was both speculative and potentially confusing to the members. Nor was the proffer "precise in describing limitations" as to the potential expert testimony. *Cf. United States v. St. Jean*, 45 MJ 435, 444 (1996): "We note that there is an enormous difference between asserting that persons who bear certain characteristics are likely to have committed crime (as appellant seeks to argue), and asserting that persons who manifest particular characteristics are likely to have a certain mental state or condition (as was at issue in St. Jena)." We hold that the military judge did not abuse his discretion by excluding the evidence under Rule 403.

Notwithstanding the exclusion of Dr. Sharbo's testimony, appellant did present his defense to the court members through other means. Through the cross-examination of Mrs. Dimberio, appellant showed that she had been alone with Jarod for three days while appellant was out in the field, just prior to the 2nd of February (R. 182). Further, through Dr. Garman's testimony, appellant was able to show that Nicole Dimberio was stressed and nervous on the morning of February 3rd and "had the smell of alcohol about her." (R. 485–486). The only area which appellant's defense counsel was not allowed to explore was Nicole Dimberio's mental health diagnosis and its link to the baby.

In view of the foregoing, the military judge did not abuse his discretion as the "evidentiary gatekeeper" by excluding Mrs. Nicole

---

10. The Supreme Court of the United States set out a similar analysis in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

11. Mil.R.Evid.

12. Same as Fed.R.Evid. 403. Mil.R.Evid. 403, Drafters' Analysis, Manual, *supra*, at A22–34.

Dimberio's mental health diagnosis. *See General Electric Company v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *United States v. Schlamer,* 52 MJ 80 (1999); *United States v. Miller,* 46 MJ 63 (1997).

Accordingly, the decision of the United States Air Force Court of Criminal Appeals is affirmed.

SULLIVAN, Judge (concurring in the result):

### OVERVIEW

Appellant contends that an erroneous evidentiary ruling by the military judge violated his constitutional right to present his defense at this court-martial. The majority holds that defense-proffered evidence was properly excluded by the military judge under various military rules of evidence and that no infringement of appellant's constitutional right to present his defense occurred. The dissent asserts that both evidentiary and constitutional error occurred in this case. I agree with the dissent that the military judge's relevance ruling was erroneous, but I conclude that it did not materially prejudice appellant or amount to constitutional error.

### The Court–Martial

Appellant was found guilty of assault with a means likely to produce grievous bodily harm on his 4–week–old son, Jarod; the prosecution's case, however, was based only on circumstantial evidence. There were no eyewitnesses to the crime and only appellant and his wife had significant access to the baby that night.

At issue on this appeal is the correctness of the judge's decision excluding certain defense evidence which appellant argues circumstantially showed an alternate perpetrator of the charged offense, *i.e.,* his wife, Nicole Dimberio. Appellant had offered expert testimony from a psychiatrist, Doctor Sharbo, that appellant's wife had a personality disorder including traits of impulsivity and the inability to handle stress well. He asserted that this expert testimony was relevant in light of Doctor Wacksman's expert testimony, previously admitted, that shaken-baby injuries such as baby Jarod's are usually caused by impulsive acts of a caregiver under stress. (R. 276–77)

More particularly, defense counsel at trial offered expert testimony from Doctor Sharbo as to Mrs. Dimberio's character disorders of impulsivity and inability to handle stress.[1] He did so for three reasons:

*First,* to show her character and draw an inference therefrom and from other evidence in this case that she did the charged act (R. 498)[2]; *second,* to show that appellant did not act intentionally if he did the charged act[3]

1. Mil.R.Evid. 405, Manual for Courts–Martial, United States, 1984, provides for proof of character by means of opinion testimony without distinguishing between lay and expert testimony. *See* 2 Weinstein, *Federal Evidence* § 405.04[2][a]. Moreover, federal courts and most state courts consider expert-opinion testimony on personality traits as character evidence within the meaning of this rule. *See* 2 Weinstein, *Federal Evidence* § 405.04[2][c]; 3 *Jones on Evidence–Civil and Criminal* § 16:24 (7th ed.1998). *See also United States v. Nunn,* 940 F.2d 1148, 1149 (8th Cir. 1991); *United States v. Roberts,* 887 F.2d 534, 536 (5th Cir.1989); *State v. Shuck,* 953 S.W.2d 662 (Tenn.1997); *People v. Stoll,* 49 Cal.3d 1136, 265 Cal.Rptr. 111, 783 P.2d 698 (1989). *But see State v. Ambrosia,* 67 Ohio App.3d 552, 587 N.E.2d 892, 899 (1990); *State v. Conlogue,* 474 A.2d 167, 172 (Me.1984); *see generally State v. Hulbert,* 481 N.W.2d 329, 333–34 (Iowa 1992); *Commonwealth v. Trowbridge,* 36 Mass.App.Ct. 734, 636 N.E.2d 291, 295–96 (1994).

2. With certain carefully-limited exceptions (for the accused, a victim, or a witness), evidence of a person's character is not admissible to show a person acted in conformity with that character. *See* Mil.R.Evid. 404(a). It is black-letter law that a criminal accused may *not* introduce character evidence to show a third party committed the charged offense. *See* 1A Wigmore, *Evidence* § 68 (Tillers rev.1983); 22 Wright and Graham, *Federal Practice and Procedure: Evidence* § 5236 at 385–86 (1978); *but see State v. Anderson,* 379 N.W.2d 70, 79 (Minn.1985). Accordingly, in my view, the defense-proffered evidence here was *per se* inadmissible for the purpose of showing Mrs. Dimberio acted in accordance with this character on the night in question. *See generally* S. Childress and M. Davis, 1 *Federal Standards of Review* § 4.03 at 4–29 (3d ed.1999).

3. The challenged evidence showed Mrs. Dimberio's character disorders and probable state of mind, not appellant's. Accordingly, it was clearly irrelevant to show that appellant did not act

(R. 501); *third*, to show Mrs. Dimberio's state of mind, a circumstantial fact identifying her as the actual perpetrator of the charged offense (R. 502). The military judge ruled that the evidence was irrelevant because there was no showing of nexus between Mrs. Dimberio's character disorders and the acts of violence charged in this case. (R. 501, 503)

### Erroneous Relevancy Ruling

In my view, the military judge clearly erred when he concluded that the defense-proffered expert testimony was *not relevant* to a material issue at appellant's court-martial. *See* Mil.R.Evid. 401 and 402. The third reason for which the defense offered expert testimony in this case was that appellant's wife had certain character disorders (instability and inability to handle stress) and therefore she was probably stressed out on the night that baby Jarod was assaulted. It further offered this evidence of Mrs. Dimberio's mental state on the night in question to establish a fact identifying her, not appellant, as the assailant of baby Jarod. *See generally* 3 *Jones on Evidence–Civil and Criminal* § 17:39 (7th ed.1998) (distinguishing between identity evidence and evidence offered to show conduct). This was a viable evidentiary theory and purpose in appellant's case. *See* 2 Wigmore, *Evidence* §§ 411–13 (Chadbourn rev.1979); *see also United States v. St. Jean*, 45 MJ 435, 444 (1996); *United States v. Combs*, 39 MJ 288, 291 (CMA 1994).

Moreover, there was evidence linking Mrs. Dimberio's character disorders to that particular mental state, and linking that mental state to a violent assault. Doctor Wacksman, a government witness, testified on direct examination that the injuries inflicted on Jarod were consistent with an intentional assault or shaken baby syndrome. He further agreed on cross-examination by the defense that

shaken baby syndrome was an unpremeditated event related to stress and resulted from "an acute abrupt momentary loss of control by the caregiver." (R. 277) Clearly, this expert testimony established the necessary scientific nexus between the proffered defense evidence and the charged offense, and it went beyond mere speculation. *Cf. United States v. Han*, 230 F.3d 560, 563 (2d Cir. 2000); *see State v. Miller*, 709 P.2d 350, 353 (Utah 1985); *see generally State v. Oliviera*, 534 A.2d 867 (R.I.1987). In my view, this evidence was relevant to show the identity of an alternate perpetrator of the charged offense (one of the classic defenses to any crime). *Cf. United States v. Powers*, 59 F.3d 1460, 1471–73 (4th Cir.1995) (no "valid scientific connection" established between a particular criminal offense and evidence that appellant does not fit profile of one who could commit that offense).[4]

### Prejudice

Nevertheless, other evidence showing Mrs. Dimberio's stressed-out mental state on the night in question was admitted in this case. It could also serve as a basis to identify her as the perpetrator of the charged offense and permit appellant to present his alternate-perpetrator defense to the members. (R. 600, 604–05) In these circumstances, I conclude that the military judge's erroneous evidentiary ruling did not materially prejudice appellant's rights or amount to constitutional error. *See generally Fortini v. Murphy*, 257 F.3d 39, 47–48 (1st Cir.2001) (erroneous exclusion of defense evidence under circumstances did "not rise to the level of a *Chambers*[5] violation"); *Romano v. Gibson*, 239 F.3d 1156, 1166–68 (10th Cir.2001) (no constitutional error where only incremental evidence of alternate perpetrator improperly excluded); *People of Territory of Guam v.*

---

with the requisite criminal intent for conviction of aggravated assault.

4. The majority asserts that the proffered defense evidence was inadmissible under Mil.R.Evid. 403 and 702. The military judge, however, ruled that the proffered defense evidence was not relevant; he did not do a balancing test or rule that the evidence was relevant but unfairly prejudicial

under Mil.R.Evid. 403. Moreover, the majority's conclusion under *"Daubert"* and *"Houser,"* 56 MJ at 27, ignores the scientific-nexus testimony of Doctor Wacksman and, in my view, conflicts with this Court's decision in *United States v. St. Jean*, 45 MJ 435, 444 (1996).

5. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

*Ignacio,* 10 F.3d 608, 615 (9th Cir.1993) (excluded defense evidence not substantial).

On this point, I again emphasize that defense counsel argued, *inter alia,* that the proffered defense-expert evidence was relevant to show Mrs. Dimberio's stressed state of mind on the night of the alleged assault of her baby. He then argued that her stressed state of mind, among other facts, identified her, not appellant, as the assailant of baby Jarod. However, Doctor Garman, a witness for the defense, also testified that Mrs. Dimberio told him the morning after the assault that she was stressed the night before. (R. 485, 491, 494). Direct evidence of this state of mind in the form of an admission by Mrs. Dimberio was certainly stronger than the circumstantial showing of this same state of mind, based on her character disorders, which was prohibited by the judge. Moreover, defense counsel was free to argue and did argue that this was "a crime .... of stress" and Mrs. Dimberio was a stressed out person on the night in question. (R. 604–05)

In reaching the above conclusions I have relied heavily on my reading of the record of trial and my understanding of the positions of the parties at this court-martial. In my view, the prosecution relied most heavily on appellant's pretrial admissions to possibly injuring the child by accident. It was the defense, in an attempt to focus suspicion on Mrs. Dimberio as the actual assailant, who first played the psychological-character card during pre-trial motions and in the opening argument of the trial. (R. 26–30, 48–50, 51–53, 96–98, 100). In sum, appellant was entitled to a fair trial, not a perfect trial, and that is exactly what he received in this case.

EFFRON, Judge (dissenting):

Four weeks after his birth, Jarod Dimberio sustained severe trauma, including injuries to his nose, eyes, and brain. The medical personnel who treated Jarod and examined his records testified that Jarod's injuries were consistent with "non-accidental trauma" and that Jarod had been shaken violently. The evidence introduced at trial indicated that only two people had access to Jarod and the opportunity to inflict such injuries during the

pertinent time period—appellant and his wife, Nicole. The evidence called upon the members to decide which parent was the perpetrator.

The prosecution, during its case-in-chief, focused significant attention on the state of mind of the perpetrator of a "shaken baby" crime. The military judge excluded critical, relevant defense evidence which squarely joined issue with the prosecution's evidence concerning the state of mind of the perpetrator. Under the circumstances of this case, that ruling denied appellant his constitutional right to present a defense. *See Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *accord Davis v. Alaska,* 415 U.S. 308, 317, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). I respectfully dissent.

## I. BACKGROUND

### A. *Consideration of the Expert's Testimony at Trial*

There was no eyewitness testimony or other direct evidence as to who caused Jarod's injuries. The Government, relying on circumstantial evidence, sought to explain to the members why appellant, as a parent, would have inflicted such violent injuries on his newborn child.

The Government introduced explicit medical expert testimony of Dr. Wacksman that "the constellation of symptoms" seen in Jarod was "typical shaken baby syndrome." Dr. Lonergan, another prosecution expert witness, similarly testified on direct examination that Jarod "was a violently shaken baby." On cross-examination, Dr. Wacksman testified that shaken baby injuries typically result when the response of a care giver to stressors results in an "acute, abrupt, momentary loss of control." The experts' testimony was accompanied by prosecution evidence that on the night of Jarod's injuries, appellant had been tired and under work-related stress. The prosecution asked the factfinders to infer the following from this evidence: Jarod suffered injuries that typically are inflicted by care givers who react acutely and abrupt-

ly with momentary loss of control under stress; appellant was a care giver who was tired and under stress at the time in question; therefore, appellant cracked under stress and inflicted Jarod's injuries.[1]

In response, the defense sought to rebut the inferences suggested by the Government and to develop alternative inferences. In support of the inference that he was not the person who had lost his composure and shaken Jarod, appellant introduced evidence that he was calm under pressure and responded well to stress, even when tired and upon being awakened from sleep.

To complement the evidence that he was not the likely perpetrator, appellant attempted to demonstrate that the only other possible perpetrator—Nicole—was the more likely culprit. Defense counsel sought to introduce the expert testimony of Dr. Sharbo, a forensic psychiatrist whom the military judge earlier had appointed to assist the defense in reviewing Nicole's medical records. According to defense counsel's proffer, Dr. Sharbo would state his expert opinion that Nicole had certain mental disorders and traits that historically had led to impulsivity and instability and that, under these circumstances, she "would not be expec[t]ed to handle stressful situations well." He would base the testimony on a personal interview with Nicole, review of her medical and psychological records and the report of the investigation under Article 32, UCMJ, 10 USC § 832, and consultation (with Nicole's permission) with her previous treating psychiatrist.

Defense counsel proffered to the military judge that the evidence would reveal that Nicole had "suffered from major depression for over 6 years, as noted in the records, and that this major depression was manifested in many ways, primarily, as far a[s] we are concerned, in her ability to handle stressful situations and anger problems." This dovetailed, in the defense view, with: (1) "evidence of a stressful situation for [Nicole] that

evening"; (2) evidence that "she was drinking that night" and that "when she drinks alcohol she has a much greater inability to control her anger and stress"; and (3) testimony from the prosecution's expert witnesses that "in a shaken baby syndrome it normally is related to the ability of the care giver to handle a stressful situation, either as exhibited by the baby or by external factors that that care giver is experiencing at that particular time that might not be related to the baby in particular."

The military judge questioned defense counsel concerning the "nexus" between evidence that Nicole had difficulty in handling stress and the implication that the defense sought to make that she would respond to stress with violence, particularly violence toward her baby. Defense counsel answered that the proffered evidence "is the type of evidence that we think is going to link her psyche, if you will, her personality disorder, her major depressive disorder, her long history of anger and stress control related problems to that night and her ability, because of that, to handle any particular stressful situation that occurred." The military judge did not accept this connection, commenting that, "unless you can provide the link to her being violent that night, her acting out that night, then there is not a nexus there and you have a bridge that you have got to connect up some way." Defense counsel responded:

> Your honor, if people had seen Mrs. Dimberio acting out that night toward her son with all due respect, I don't think we would be here in this courtroom today. The fact of the matter is abuse of the child in these situations is normally not seen by a third party.... [I]n these particular types of cases the doctors will tell you that it all deals with stress and the ability to deal with stress. This is what causes the care giver to do this to the child, so, if we have a care giver, the mother, who had complete and equal access to that child that evening,

1. Trial counsel's rebuttal argument during closing relied on Dr. Wacksman's testimony, contending that this "is most likely a shaken baby rather than an impact trauma...." In arguing that appellant had the mental state to inflict such injuries, trial counsel argued that appellant had been "tired" that night and had "become upset" with Jarod. He contended that the evidence showed a "deliberate shaking of the baby out of frustration, out of anger, out of being upset."

who has a psychological disorder, an axis disorder that causes them, such as major depression, which we understand does not abate over time, that that is relevant to determining whether or not we are talking about the identity of the perpetrator, it is more likely that that care giver is the one that could not handle the stressful situation that caused the injuries to Jarod.

Defense counsel reinforced that view in later argument to the military judge:

[I]f he is going to come in here and tell the court that she has a major depressive disorder and that she has a personality disorder that exhibits itself in an inability or a decreasability to handle stressful situations then I think that that opinion is admissible to the court members, not, your honor, anything specifically about past instances or past stressful situations or past alcohol use except as it applies to the doctor forming his opinion that in the opinion format without going into specifics he then provides to the jury. We do know that at least she told one doctor that night that she was stressed and we do know that she was drinking alcohol. I think that is the link there in regards to her personality disorders or major depression, if any, that she certainly has had for 6 years as far as major depression. I understand that it has not disappeared at will and the issue of identity and motive in this case.

Shortly after this argument, the military judge deferred ruling on the matter until later in the trial.

The Government subsequently "move[d] under its existing motion *in limine* to exclude this testimony [of Dr. Sharbo] on the grounds that it doesn't meet the relevance criteria under [Mil.R.Evid.] 401 or 403." The prosecution argued that the proposed defense testimony was not relevant because there was no evidence that Nicole had faced a stressful situation that evening or that she would respond to stress with violence toward children.

The military judge ruled that the testimony of Dr. Sharbo was inadmissible. Although he did not cite a specific basis for his opinion, he indicated that the evidence was not relevant because the defense did not demonstrate that Nicole had reacted violently in response to stress in the past. *See* Mil.R.Evid. 401 and 402.

### B. *Consideration of the Expert's Testimony on Appeal*

In the Court of Criminal Appeals, appellant renewed his argument that Dr. Sharbo's testimony was relevant and admissible. 52 MJ 550 (1999). The court concluded that "while the military judge's reliance on the fact that there was no evidence that Mrs. Dimberio had ever assaulted an infant may have been overly narrow in scope, this does not detract from the essential correctness of his ruling." *Id.* at 557.

According to the Court of Criminal Appeals, "[t]he critical deficiency of appellant's proffer was its reliance on a predisposition or profile, which in turn depended upon a trait of Mrs. Dimberio's character. This is specifically prohibited by Mil.R.Evid. 404(a)...." *Id.* at 558. The court stated that it did "not read the rules of evidence or case law as permitting a trial to be decided by traits associated with a personality disorder," and it concluded that "the military judge was well within his discretion in reaching [the] conclusion" that "Mrs. Dimberio's personality disorder was not relevant and, therefore, not admissible." *Id.* at 559.

In the present appeal, the granted issue requires our Court to determine whether the expert testimony was relevant and admissible. The majority would affirm the exclusion of Dr. Sharbo's testimony on several bases. First, the majority asserts that appellant "did not offer an appropriate foundation for the introduction of ... opinion-type evidence" as to a character trait of Nicole. According to the majority, "The expert in this case had not known Mrs. Dimberio long enough to have formed a traditional opinion as to her character ...." and "the defense [did not] offer specific instances of conduct by Mrs. Dimberio." 56 MJ at 26. Second, the majority apparently concludes that the defense proffer did not establish the relevance of the evidence, noting that "what is missing here is an adequate proffer that this evidence of Mrs. Dimberio's mental health

problems had a nexus or link to behavioral traits of acting out and violence." *Id.* at 27. Third, the majority holds that even if relevant, "the evidence would still be inadmissible under [Mil.R.Evid.] 403's balancing test" because the proffered evidence was "both speculative and potentially confusing to the members," absent a showing that Nicole's problems were tied to violence. *Id.* at 27. Finally, the majority indicates that any error was harmless because "appellant did present his defense to the court members through other means," including evidence that Nicole was under stress at the time in question and that she apparently had been drinking alcohol. *Id.* at 27.

## II. ADMISSIBILITY OF THE EXPERT'S TESTIMONY

### A. *Foundation for Expert Opinion*

Mil.R.Evid. 405(a) provides that, whenever "evidence of character or a trait of character of a person is admissible, proof may be made ... by testimony in the form of an opinion."[2] This rule includes testimony of the opinion of a psychiatrist that is based on a professionally satisfactory foundation. *See* Advisory Committee's Note to Fed.R.Evid. 405, *In re Townsend,* 56 F. 222 (1893) (acceptable form of opinion testimony includes "the opinion of the psychiatrist based upon examination and testing"); *United States v. St. Jean,* 45 MJ 435, 442–44 (1996) (in murder trial where victim's state of mind was in issue, testimony of a psychiatrist, who had examined copious records and documents relating to the victim and the crime, was admissible to offer his opinion that he detected no indication that the victim was either depressed or "highly impulsive," which he already had testified were characteristics of persons with a high risk of committing suicide); *State v. Christensen,* 129 Ariz. 32, 628 P.2d 580, 582 (1981)

(in murder trial where the defendant's premeditation was in issue, testimony of a psychiatrist, who had interviewed the defendant and had reviewed tests administered to him, was admissible to offer opinion that the defendant "had difficulty dealing with stress and in stressful situations his actions were more reflexive than reflective"). *See also* 3 *Jones on Evidence: Civil and Criminal* § 16:24 at 152–54 (7th ed.1998); Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, 1 *Federal Rules of Evidence Manual* (hereafter Saltzburg) 402–03 (7th ed.1998), discussing *United States v. Staggs,* 553 F.2d 1073 (7th Cir.1977) ("In dictum, the Court seemed to approve the use of an expert opinion as to the character of a criminal defendant, which Rules 404(a) and 405 do not prohibit but which generally was not permissible at common law."). *See also* Saltzburg, *supra* at 402, discussing *United States v. Roberts,* 887 F.2d 534 (5th Cir.1989) ("The Court held it was error, but harmless, to exclude testimony of a psychologist that the personality of a defendant charged with cocaine offenses was consistent with his claimed activity as a self-appointed vigilante.").

In the present case, Dr. Sharbo personally interviewed Nicole, discussed the matter with her previous treating psychiatrist, and reviewed Nicole's medical and psychological records as well as the Article 32 investigation report. These actions established a legally sufficient foundation for Dr. Sharbo to offer the expert psychiatric opinion testimony proffered by the defense. *See* Mil.R.Evid. 703, Bases of Opinion Testimony by Experts; Stephen A. Saltzburg, Lee D. Schinasi, and David A. Schlueter, *Military Rules of Evidence Manual* 865 (4th ed.1997) ("Under Rule 703, an expert may base her opinion upon facts or data that she has perceived, learned from study or experiment, or been told about, either by watching the proceeding

---

2. The commentators are divided as to whether opinion testimony like that proffered by the defense in this case implicates traits of character within the meaning of Mil.R.Evid. 404. *Compare, e.g.,* 2 Weinstein's *Federal Evidence* § 405.04[2][c] at 405–28 to 405–29; 3 *Jones on Evidence: Civil and Criminal* § 16:24 at 152–54 (7th ed.1998), *with* 1A *Wigmore, Evidence* § 83 at

1599 (Tillers rev.1983); Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, 1 *Federal Rules of Evidence Manual* 529, Advisory Committee's Note on original Fed.R.Evid. 404(a) (7th ed.1998); and Christopher B. Mueller and Laird C. Kirkpatrick, 1 *Federal Evidence* § 101 at 522 (2d ed.1994). *See also Wigmore, supra* § 51 at 1145–46.

**34**

in court, or from other sources outside court."); *id.* at 841 ("[P]ursuant to Rule 703, counsel may rely on expert witnesses to provide opinion testimony which is not based on first hand knowledge or observation."); *State v. Christensen, supra* (in murder trial, psychiatric evidence as to defendant's proclivity toward reflexive actions under stress was admissible on question whether appellant killed his wife with premeditation or impulsively). *Cf. St. Jean, supra* at 444 ("[V]icarious fact-gathering is expressly permissible and normal in the medical, psychiatric, and psychological fields.").

### B. *Relevance of the Expert's Testimony*

The prosecution's theory of the case and the evidence introduced by the prosecution placed the psychological condition of the perpetrator squarely at the center of this trial. Only one of two people could have shaken Jarod and caused these injuries—appellant or Nicole. There was no evidence that either appellant or Nicole previously had responded to stress with violence in general or violence against a child in particular. On this occasion, however, one of them did so. The heart of appellant's defense sought to focus the members on the question of whether it was appellant or Nicole who had responded to stress with violence against their child.

In this context, the prosecution emphasized factors relevant to appellant's mental condition—that he had been tired and under stress on the night in question. The prosecution—consistent with their expert's opinion—did not attempt to show that he had reacted to stress with violence in the past or that the stress preceding the incident was necessarily related to the baby. The proffered expert testimony as to the impact of Nicole's psychological condition on her ability to cope with stress was at least as compelling as the prosecution's evidence concerning appellant.

"[A]nything that can help rationally decide disputed issues and be helpful to the finder of fact is relevant.... If evidence is of any value at all, it qualifies under the Rule." *Military Rules of Evidence Manual, supra* at 474. Where the prosecution's own evidence indicated that the perpetrator probably was someone who cracked under stress without necessarily having done so in the past—and without any showing that the stress was caused by the baby—the military judge erred in concluding that it was "irrelevant" that Nicole's mental condition was such that she could be expected to have difficulty with stress. Under these circumstances, the excluded testimony of Dr. Sharbo would have had some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable ... than it would be without the evidence." Mil.R.Evid. 401.

### C. *Mil.R.Evid. 403*

Mil.R.Evid. 403 precludes admission of relevant evidence under six circumstances. Even though "relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The military judge commented at one point that without some showing that Nicole's mental condition would lead her to respond to stress with violence, the evidence in question "should be excluded under any type of [Mil.R.Evid.] 403 balancing test." The military judge, however, did not indicate what was so objectionable about the evidence that it substantially outweighed the probative value. In the absence of any analysis by the military judge, the majority attempts to perform the balancing test under Mil.R.Evid. 403, asserting that the proffered evidence would have been "both speculative and potentially confusing to the members." 56 MJ at 27. The majority offers no analysis, however, as to why this evidence would have been so flawed.

Moreover, whether it would have been "potentially confusing" is not the test under Mil.R.Evid. 403; rather, the test is whether such difficulties as danger of unfair prejudice or confusion of the issues "substantially outweigh[ ]" the "probative value" of the evidence. Mil.R.Evid. 403 "is constructed to favor the admission of evidence, as a result

exclusion of otherwise relevant testimony should be rarely invoked." *Military Rules of Evidence Manual, supra* at 490; *see United States v. Roberts,* 88 F.3d 872 (10th Cir. 1996); *United States v. Mende,* 43 F.3d 1298 (9th Cir.1995); *United States v. Terzado–Madruga,* 897 F.2d 1099 (11th Cir.1990). "The use of the word 'substantially' in the Rule suggests that in close cases the drafters intended that evidence should be admitted rather than excluded." *Military Rules of Evidence Manual, supra* at 491. *See United States v. Mende, supra; United States v. Krenzelok,* 874 F.2d 480 (7th Cir.1989).

Furthermore, the "prejudice" that the rule seeks to avoid is the danger of "unfair prejudice"—that is, the danger that the evidence will be used "for something other than its logical, probative force." *Military Rules of Evidence Manual, supra* at 492.[3] The nature of the proffered evidence—given the context of this trial and the prosecution's evidence—would have sharpened the issues and would have provided a complete picture of the defense theory for the members' consideration without being unfairly prejudicial to the Government, confusing the issues, or misleading the members. Under these circumstances, Mil.R.Evid. 403 does not provide a basis for exclusion of the expert's testimony.

### D. *Mil.R.Evid. 404*

Mil.R.Evid. 404(a) generally excludes "[e]vidence of a person's character or a trait of a person's character ... for the purpose of proving that the person acted in conformity therewith on a particular occasion...." The rule is based on the premise that character evidence offers "little probative value" in such circumstances, while creating a significant risk of diverting the members' deliberations through the interjection of irrelevant issues. *See Military Rules of Evidence Manual, supra* at 524.

Subsections (1)–(3) of Mil.R.Evid. 404(a) recognize three exceptions to the general rule of inadmissibility: (1) evidence of a pertinent character trait of an accused offered by the accused, or by the prosecution to rebut it; (2) evidence of a pertinent character trait of the victim offered by the accused, or by the prosecution to rebut it; and (3) evidence of the character of a witness offered to impeach the witness under Mil.R.Evid. 607–609.

One explanation for these historical exceptions is that when an accused initiates use of a character trait "to exonerate himself, the problem of prejudice is altogether different. Now, knowledge of the accused's character may prejudice the jury in his *favor,* but the magnitude of the prejudice or its social cost is thought to be less." 1 *McCormick on Evidence* § 191 at 673 (5th ed.1999) (emphasis in original). *Cf.* 1 *Federal Rules of Evidence Manual, supra* at 374 (the rationale for the exception permitting an accused to introduce evidence of his own character "is that the defendant deserves the benefit of all reasonable doubts and that good character may produce a reasonable doubt."). Similarly, in commenting on the exception relating to the defense introduction of evidence of the victim's character, the *McCormick* text states:

> That the character of the *victim* is being proved renders inapposite the usual concern over the untoward impact of evidence of the defendant's poor character on the jury's assessment of the case against the defendant. There is, however, a risk of a different form of prejudice. Learning of the victim's bad character could lead the jury to think that the victim merely "got what he deserved" and to acquit for that reason. Nevertheless, at least in murder and perhaps in battery cases as well, when the identity of the first aggressor is really in doubt, the probative value of the evidence ordinarily justifies taking this risk.

---

3. "[P]ractice often demonstrates that counsel's arguments for excluding testimony largely consist of undefined, conclusory references to the evidence's prejudicial effects, rather than pointed demonstrations of the evidence's *unfairly* prejudicial impact on the court members' ability to properly evaluate the other admissible evidence and reach an appropriate, non-emotional, result thereon. Unless counsel can articulate why the evidence will be *unfairly* used, it can be admitted." *Id.* at 492–93. (last emphasis added).

*McCormick, supra* at 681 (emphasis in original).

Mil.R.Evid. 404(a) does not express an exception permitting the defense to introduce evidence of a relevant character trait of a third-party alternate perpetrator. Nonetheless, the considerations applicable to both the general rule of exclusion and the specific exceptions would seem to apply with equal force to an exception in this area. Tiller's 1983 revised edition of 1A *Wigmore, Evidence* § 68 at 1444 contains the following observation:

> [I]f one takes the view that character evidence is relevant and that the main reason for its usual exclusion is the danger of prejudice to the parties, it is not insensible to take the view that evidence of the character of third persons should be admissible when there is no substantial danger that the trier of fact will draw inferences about the character of the parties as a result of his views of the character of the nonparties.

(Citations omitted.) The authors quote the following passage from Professor Wigmore's third edition of the Treatise that pointedly reflects this view:

> Where the character offered is that of a third person, not a party to the cause, the reasons of policy for exclusion seem to disappear or become inconsiderable; hence, if there is any relevancy in the fact of character, i.e., if some act is involved upon the probability of which a moral trait can throw light, the character may well be received.

(Citations omitted.)

In this case, the disputed evidence of Dr. Sharbo's testimony was critically important to the defense and went directly to the heart of the case, as shaped by the prosecution, and the question before the members: Which of two parents had violently injured Jarod? In that context, the relevance of the evidence was great and the risk of unfair prejudice and confusion was minimal, consistent with the rationale underlying Mil.R.Evid. 404. Under those circumstances, the rule cannot impede appellant's constitutional right to a fair trial and a full presentation of his defense theory that Nicole committed the crime. *See Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Cikora v. Dugger,* 840 F.2d 893 (11th Cir.1988). *Cf. DePetris v. Kuykendall,* 239 F.3d 1057, 1062 (9th Cir.2001) (trial court's erroneous exclusion of crucial defense evidence as irrelevant "went to the heart of the defense" and, so, denied defendant's "Fifth Amendment due process right to a fair trial" and her "Sixth Amendment right to present a defense," citing *Chambers v. Mississippi, supra*).

## III. PREJUDICE

The majority takes comfort in the fact that "appellant did present his defense to the court members through other means," 56 MJ at 27, noting that the members heard evidence that Nicole was under stress and " 'had the smell of alcohol about her.' " The majority concludes: "The only area which appellant's defense counsel was not allowed to explore was Nicole Dimberio's mental health diagnosis and its link to the baby." *Id.* at 27.

Without evidence of Nicole's mental health diagnosis and the expert's testimony concerning the likelihood that she would have difficulty handling stress, particularly when under the influence of alcohol, the defense was deprived of the testimony necessary to explain the significance of the evidence that she was under stress and had been drinking. It is not unusual for persons to be under stress, to drink alcohol, or both. What was missing in this case was the opportunity for the defense to present evidence that gave meaning to these factors—that this particular person had a mental condition that could cause her to respond in a certain way when under stress and particularly when drinking alcohol. Under these circumstances, the exclusion of the proffered expert testimony of Dr. Sharbo materially prejudiced the substantial rights of appellant. *See* Art. 59(a), UCMJ, 10 USC § 859(a).